SARGENT COUNTY BANK,
Plaintiff and Appellee,

v.

John WENTWORTH and Beth
R. Wentworth, Defendants
and Appellants.

Civ. No. 920100.

Supreme Court of North Dakota.

May 17, 1993.

W. Todd Haggart (argued), of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for plaintiff and appellee. Appearance by Harlan Klefstad, President of Sargent County Bank.

Robert J. Snyder (argued) and James J. Coles (appearance), of Wheeler Wolf, Bismarck, for defendants and appellants. Appearances by John and Beth Wentworth.

MESCHKE, Justice.

John and Beth R. Wentworth appeal from a judgment awarding Sargent County Bank a deficiency judgment of nearly $216,000 against them and dismissing their counterclaims against the Bank. We reverse and remand for a new trial before a different trial judge.

Resolution of this case requires a protracted recitation of the background. The Wentworths operated a large farm and ranch in Sargent County. Since 1968, the Wentworths did business with the Bank, and after 1970, dealt primarily with its loan officer and vice president, D. Dean Rockswold. During the 1980s, the Wentworths received numerous loans[1] from the Bank,

1. The trial court found that the Wentworths had executed the following promissory notes that are the subject of this action:

a. Note dated March 6, 1984 in the principal amount of $225,000, representing renewal of the then existing chattel and operating loans and bearing the signature of "John E. Wentworth." ...

b. Note dated September 30, 1985 in the principal amount of $7,800, representing renewal of loan for a Gleanor combine and bearing the signature of "Beth R. Wentworth" under the typed words "Wentworth Ranch."
...

c. Note dated December 16, 1985 in the principal amount of $106,400, representing renewal of 1985 operating loans and bearing the signature of "John E. Wentworth" under the typed words "Wentworth Ranch." ...

d. Note dated December 30, 1985 in the principal amount of $16,377, representing an operating loan signed by "John E. Wentworth."
...

e. Note dated January 30, 1986 in the principal amount of $11,550, representing an operating loan signed by "John Wentworth." ...

f. Note dated February 28, 1986 in the principal amount of $3,000, representing an operating loan and bearing the signature of "John E. Wentworth" under the typed words "Wentworth Ranch." ...

g. Note dated March 31, 1986 in the principal amount of $11,000, representing an operating loan and bearing the signature of "John Wentworth" under the typed words "Wentworth Ranch." ...

h. Note dated May 13, 1986 in the principal amount of $4,077.45, representing an operating loan bearing the signature of "Beth R. Wentworth" under the typed words "Wentworth Ranch."

i. Note dated May 19, 1986 in the principal amount of $8,275.79, representing an operating loan bearing the signature of "Beth R. Wentworth" under the typed words "Wentworth Ranch." ...

j. Note dated June 17, 1986 in the principal amount of $7,000, representing an operating loan bearing the signature "Wentworth Ranch John E. Wentworth" under the typed words "Wentworth Ranch." ...

k. Note dated June 30, 1986 in the principal amount of $10,000 representing an operating loan bearing the signature of "John E. Wentworth" under the typed words "Wentworth Ranch." ...

l. Note dated July 28, 1986 in the principal amount of $5,634.39, representing an operating loan bearing the signature of "John E. Wentworth" under the typed words "Wentworth Ranch." ...

m. Note dated September 8, 1986 in the principal amount of $9,393.91, representing an operating loan bearing the signature of "John E. Wentworth" under the typed words "Wentworth Ranch." ...

n. Note dated November 24, 1986 in the principal amount of $5,250, representing an operating loan bearing the signature of "John E. Wentworth" under the typed words "Wentworth Ranch." ...

o. Note dated December 3, 1986 in the principal amount of $4,430, representing an oper-

which were secured by four security agreements.[2]

In February 1984, the Bank's statutory lending limit was $225,000 per customer. As of March 6, 1984, the Wentworths owed the Bank a total of $225,000 in chattel loans based on a $200,000 promissory note dated December 5, 1983, and on a $25,000 promissory note dated February 24, 1984. The accrued interest on these two notes totaled $6,910.94. Rockswold learned of a Farmers Home Administration [FmHA] loan guarantee program and suggested a guarantee to the Wentworths. Because the amount guaranteed by FmHA would not count toward the Bank's per customer lending limit, the Bank could continue its financial assistance to the Wentworths. According to the Bank, this was the first time Rockswold had applied for a FmHA guarantee. As part of the application process, the Bank certified that the guarantee was necessary for the continuation of a viable farming or ranching operation. At that time, the Wentworths had an equity cushion of more than $60,000 between their debt and the value of their collateral.

On March 6, 1984, John Wentworth signed a promissory note for $225,000, representing the same debts covered by the December 1983 and February 1984 notes. FmHA soon guaranteed 90 percent of this note. The note designated a variable interest rate and was payable in seven annual installments of $52,476.38 each, with the first installment due on March 6, 1985. As primary security to FmHA for the loan guarantee, the Bank designated 200 of the Wentworths' stock cows and six bulls valued at $120,000, and farm equipment valued at $212,500. According to the Bank, this was the security intended by the Went-

worths, the Bank, and FmHA to apply to the March 1984 note.

The December 1983 and February 1984 notes were not stamped "renewed" at that time, the Bank explained, because the Wentworths were unable to pay the $6,910.94 in accrued interest at the time. Also, the Bank claimed that it decided not to enter the March 1984 note into its books because the Wentworths had not paid the interest owed and because the computerized accounting service used by the Bank at the time was unable to accept a variable rate note involving multiple annual installment payments. As a result, the Bank apparently kept track of the interest accrual and payments made on the $225,000 debt based on the December 1983 and February 1984 notes, which the Bank continued on its books.

In early December 1984, the Wentworths sold 177 calves for $43,801.50. These proceeds were turned over to the Bank on December 17, 1984, to be applied toward the March 6, 1985 annual payment due on the FmHA guaranteed note. The Bank, however, decided instead to apply the proceeds to the interest due on the December 1983 and February 1984 notes, without informing either the Wentworths or FmHA, and applied only the balance to the principal owing on the $225,000 debt. On December 17, 1984, John Wentworth signed a single-maturity, 15–month note in the principal amount of $208,177.37, reflecting the amount of the principal payment made on the $225,000 debt. On that date, the Bank finally marked the December 1983 and February 1984 notes "renewed."

The December 17, 1984 note recited "FHA 90% Guaranteed Loan on livestock

ating loan bearing the signature of "Beth Wentworth." ...
The Wentworths had also executed a $200,000 promissory note dated December 5, 1983, a $25,000 promissory note dated February 24, 1984, and a $208,177.37 promissory note dated December 17, 1984.

**2.** The first security agreement, dated July 6, 1982, granted the Bank a security interest in all of the Wentworths' then-owned or thereafter-acquired farm equipment, vehicles, livestock, supplies, and their proceeds and products. The

second, dated May 24, 1984, granted the Bank a security interest in the Wentworths' 1984 crops grown on certain real estate, together with their proceeds and products. The third, dated March 27, 1985, granted the Bank a security interest in the Wentworths' 1985 crops grown on certain real estate, together with their proceeds and products. The fourth, dated May 13, 1986, granted the Bank a security interest in the Wentworths' 1986 crops grown on certain real estate, together with their proceeds and products.

and equipment" and set forth a variable interest rate, which was listed as 14 percent as of that date, the same rate then in effect under the March 1984 note. According to the Bank, the December 1984 note was placed on the Bank's books and was thereafter used to keep track of interest accrual and payments on the FmHA guaranteed loan. At that time, John Wentworth advised the Bank that he expected to have no additional income before March 6, 1985, to apply toward the installment payment of $52,476.38 due on that date for the March 1984 note. Although the December 1984 note was a single-maturity, 15–month note, the Bank contended that the Wentworths were told that, absent a default, only an installment payment of $52,476.38, as called for by the March 1984 note, would be due on March 6, 1986.

No additional payment was made by the Wentworths on the installment due March 6, 1985, leaving a total shortfall of $8,674.88 due on that installment. The Bank, the Wentworths, and FmHA agreed to defer collection of the balance of the installment, and no foreclosure or collection action was undertaken by the Bank or encouraged by FmHA.

Between the time the Wentworths and the Bank executed a security agreement on March 27, 1985, granting the Bank a security interest in the Wentworths' 1985 crops, and December 16, 1985, the Bank made operating loans to the Wentworths totaling $148,700. By December 16, 1985, the Wentworths had repaid $42,300 on the 1985 operating loans. The unpaid balance of $106,400 was renewed in a new note for that amount. This note was due March 6, 1986. Although the Wentworths previously had some carry-over operating debt from year to year, the operating debt carry-over at the end of 1985 was much larger than it had ever been because of losses caused by hail damage and conditions making harvest impossible.

The Wentworths and the Bank did not establish an operating budget for the 1986 crop year because, the Bank claims, the Wentworths were unable to demonstrate how they would be able to repay their operating debt from 1985 or meet their other financial obligations. The Bank, however, loaned the Wentworths funds for living expenses and for planting and harvesting a crop.

During March 1985 and March 1986, the Wentworths sold cull cows and turned the proceeds over to the Bank. These cull cows were part of the security for the FmHA guarantee, and the Bank applied the proceeds directly to the principal on, or to the "back end" of, the FmHA guaranteed loan. The Bank claimed that this action was in accordance with FmHA practices and procedures for handling the proceeds from the sale of security. These proceeds were not counted toward the annual installment payments called for by the March 1984 note.

By April 20, 1986, the Wentworths' past due operating debt to the Bank was $143,095.03. In addition, the Wentworths owed a past due March 6, 1986 installment payment of $52,476.38 on the FmHA guaranteed loan. During April 1986, the Wentworths sold their 1985 calf crop for $52,128.48. They also received $7,596.91 for the sale of some grain. John Wentworth turned these proceeds over to the Bank on April 21, 1986, and requested that the $52,128.48 in calf sale proceeds be applied by the Bank to the delinquent installment payment due on the FmHA guaranteed loan.

Instead, Rockswold told Wentworth that the Bank would apply the calf proceeds entirely to the past due operating debt. According to the Bank, because the operating loans had enabled the Wentworths to produce the calf crop, and because the calves were considered "normal income security" under FmHA policy and procedures, the FmHA did not object to the Bank applying the calf sale proceeds to payment of the loans for operating expenses, ahead of the scheduled payment on the guaranteed loan. The Wentworths did not make the March 6, 1986 installment payment on the FmHA guaranteed loan, and they made no other payments on that debt.

In May 1986, the Wentworths and the Bank began working with a farm counselor

who prepared a proposal for restructuring all of the Wentworths' debts. In August 1986, FmHA rejected the proposal for restructuring, claiming that the anticipated crop yields were unrealistic and that the plan did not show a reasonable likelihood that the Wentworths' debts to the Bank could ever be repaid. FmHA apparently believed that the Wentworths would have a substantial negative cash flow for the year, and that the equity in the farm's current and intermediate assets had deteriorated steadily from 1982 through 1986, leaving virtually no equity in the assets that secured the debt.

After FmHA rejected the restructuring proposal, the Bank made three additional loans to the Wentworths, totaling over $19,000, and released $6,324.59 in government payments to them, principally for living and harvesting expenses. The Wentworths met with Bank officers on November 6, 1986.

The Bank contends that, at this meeting, the Wentworths agreed to sell their cow herd in December 1986 because the cattle were not profitable. The Wentworths did not turn over the sale proceeds of $55,367.72 to the Bank.[3] The Wentworths did not make the March 6, 1987 installment payment of $52,476.38 due on the FmHA guaranteed note.

In May 1987, FmHA approved the Bank's plan for liquidation of the Wentworths' collateral. According to the Bank, FmHA considered the Bank "laggard" in taking action. The Bank then sued the Wentworths to foreclose its security interest in the farm equipment, livestock, crops, and proceeds securing a series of 15 promissory notes in default, and sought a deficiency judgment to the extent that the debt exceeded the value of the collateral. The Wentworths answered, alleging, among other things, that the Bank had misapplied their payments to the operating loans rather than to the FmHA guaranteed loan, and that, by doing so, the Bank had artificially created the FmHA defaults.

The Bank also sought an order for prejudgment possession of the collateral, under NDCC Chapter 32–07. In seeking this order, the Bank's attorney, Jon R. Brakke, filed a factual affidavit in which he personally attested to the validity of the 15 promissory notes evidencing the indebtedness of the Wentworths to the Bank. Although the December 1984 note was listed in the affidavit, no mention was made of the March 1984 note.

A hearing was held on June 1, 1987, before Judge Robert L. Eckert, to determine whether the Bank was entitled to immediate possession of the collateral. On July 14, 1987, the trial court issued an order granting the Bank immediate possession of various checks for crop and livestock proceeds and government payments as well as the Wentworths' remaining livestock and farm equipment, pending a final determination of the merits of the foreclosure action. The Wentworths appealed.

We dismissed the appeal for lack of appealability without a NDRCivP 54(b) order. *Sargent County Bank v. Wentworth*, 434 N.W.2d 562 (N.D.1989). Due to delays from successive bankruptcy filings by the Wentworths, the Bank did not obtain or sell all of the collateral until late 1988. In the meantime, FmHA entered into a settlement agreement with the Bank concerning the guarantee.

In early 1989, after extensive discovery, the Wentworths moved for an order allowing them to amend their pleadings to assert a counterclaim against the Bank alleging actual and constructive fraud, deceit, conversion, and fraud on the court. The Wentworths sought compensatory and punitive damages and demanded a jury trial. The trial court allowed the amendment, except for the allegation of fraud on the court. The trial court reasoned that the allegation of fraud on the court

is a non-compulsory counterclaim that could best be handled in a separate action. Further, that amendment alleges certain acts on the part of Mr. Brakke which, if granted, might require him to

The Bank applied these proceeds to the FmHA guaranteed note.

testify and thus bar him from proceeding further in this action. As this case is now over two years of age, it appears to me that to allow such an amendment which would cause further delay would be an abuse of discretion.

The trial court deferred ruling on the demand for jury trial until the pretrial conference.

In December 1989, the Bank moved to amend its complaint to include the March 1984 note as an alternate basis for the Wentworths' indebtedness. The trial court allowed the Bank to amend its complaint to allege that the Wentworths were indebted to the Bank in the amount of $192,764.10, plus accrued interest of $63,105.85 "pursuant to a promissory note dated December 17, 1984, in the original amount of $208,-177.37 or a variable rate installment promissory note dated March 6, 1984, in the original amount of $225,000, or a combination of both the December 17, 1984 and March 6, 1984 notes."

In May 1990, the Wentworths moved to disqualify the Bank's counsel and the entire Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., law firm from representing the Bank because they intended to call attorney Brakke as a witness on their behalf. The Wentworths argued that continued representation of the Bank by the law firm would result in a conflict of interest requiring disqualification under the North Dakota Rules of Professional Conduct. By this time, another member of the same law firm, W. Todd Haggart, was handling the case for the Bank. The trial court denied the motion, reasoning:

I have reviewed the briefs and affidavits submitted in support of and in opposition to the motion and have been unable to detect, at this point, any conflict between the affidavit of Mr. Brakke and the testimony of any of the Bank's witnesses which is in such conflict that a disqualification of the Bank's attorneys would be required. I also consider the fact that this litigation has been going on for a long period of time and find that to require the Bank to seek new attorneys at this late date would undoubtedly work a financial hardship on it. The court takes judicial notice of the fact that its file on this case now weighs about fifty pounds. Further, the attorneys for the Bank are now aware of the claims of the Wentworths so if subsequent discovery reveals that there may be a substantial conflict between the testimony of Mr. Brakke and the employees of the Bank, or if there is some other valid reason for disqualification, the attorneys for the Bank should reconsider their position.

The case was then assigned for trial to Judge Gordon O. Hoberg. The Bank filed a demand for change of judge, and Judge Eckert was reassigned to the case. The Wentworths' subsequent demand for change of judge against Judge Eckert was denied by Judge John T. Paulson.

At the pretrial conference in September 1991, Judge Eckert ruled that the Wentworths were not entitled to a jury trial, reasoning that their counterclaims were actually defenses and were not true counterclaims on independent causes of action. This court summarily denied the Wentworths' petition for a writ of mandamus to compel a jury trial.

One week before trial, the Wentworths moved again to disqualify Judge Eckert, this time asserting that he had "prejudged the merits of [their] counterclaims." The motion was denied.

At a trial spanning seven and one-half days of testimony, attorney Haggart represented the Bank. Parts of attorney Brakke's deposition testimony were read into the record by the Wentworths' counsel in an attempt to impeach Bank officials. In March 1992, the trial court issued lengthy and detailed findings and conclusions that essentially adopted the Bank's explanations and theory of the case. The court awarded the Bank a deficiency judgment of $216,000 against the Wentworths and dismissed their counterclaims.

The trial court ruled that the March 1984 note and 14 other notes were valid and enforceable. The court held, however, that the December 1984 note was unenforceable. The court recognized that it was "improper for the Bank to hold concurrent or

parallel notes representing the same debt," but reasoned that the Bank did not sell or transfer any of the notes to third parties, did not attempt to collect the debt more than once, and did not carry more indebtedness on its books than was actually owed by the Wentworths. The trial court found that the Bank "had no intent to harm or in any way injure the Wentworths by holding concurrent or parallel notes representing the same debt and did not gain any advantage over the Wentworths by doing so." The court also found that the Bank's holding concurrent notes "did not cause any loss or damage to the Wentworths."

The court found that the Bank did not misapply any of the monies paid by the Wentworths to the Bank. On the proceeds from the sale of 1985 calves, the trial court further reasoned that, even if those proceeds had been applied to the FmHA guaranteed debt, the note would nevertheless have been in default because the payment would have been minimally short of the installment amount. Also, the court reasoned that because the Wentworths would then have been unable to pay the operating loans when they came due, another ground existed for default under the terms of the note. The court found no material breach by the Bank of any of the agreements made contemporaneously with the FmHA loan guarantee, and that, even if there had been a breach, the only party damaged was FmHA, which was satisfied when it reached a settlement agreement with the Bank. The court found that the Wentworths had failed to prove that the Bank defrauded or deceived them, or converted any of their property. The court also found that the Bank's sale of the collateral "was commercially reasonable in all respects." The Wentworths appealed.

After they appealed, the Wentworths learned that Judge Eckert had been represented by Kermit Edward Bye, a member of the Bank's law firm, at the time when the judge heard and granted the Bank's motion for prejudgment possession of the collateral in June and July 1987. Attorney Bye represented Judge Eckert, who was one of 20 named defendants in *Williams v. State*, 405 N.W.2d 615 (N.D.1987). Attorney Brakke was also named as a defendant in that case. Although *Williams* was decided by this court on May 4, 1987, prior to the initial proceedings in this case, the Wentworths submit documentation that attorney Bye's representation of Judge Eckert in those proceedings continued at least through September 1987.

On appeal, the Wentworths assert that reversal of the judgment is required because: (1) the trial court erred in refusing to order that the Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., law firm be disqualified from serving as the Bank's trial counsel; (2) the trial court erred in denying them a jury trial; (3) the trial court erred in concluding that the debt evidenced by the March 1984 note was not discharged by a fraudulent alteration under NDCC 41–03–44; (4) the trial court erred in failing to find the Bank guilty of fraud, deceit, and conversion; and (5) Judge Eckert erred in failing to disqualify himself from the case.

I

The Wentworths argue that the trial court erred in refusing to order that the entire Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., law firm be disqualified from serving as the Bank's trial counsel in this case. Under the circumstances, we cannot say that disqualification of the law firm was required.

When this action was commenced in May 1987, the Bank applied to the court and received an order for immediate possession based on an affidavit of the Bank's attorney, Brakke. In the affidavit, Brakke swore to the authenticity, based on his personal knowledge and belief, of the December 1984 note [4] that the trial court ulti-

---

**4.** We strongly disapprove of the practice of an attorney filing a factual affidavit on behalf of his client. *See Porter v. Porter,* 274 N.W.2d 235, 243 n. 1 (N.D.1979). The comment to North

Dakota Rules of Professional Conduct 3.7 succinctly explains why:

Combining the roles of advocate and witness can prejudice the opposing party and can in-

mately determined was unenforceable. When the Wentworths' counsel learned of the existence of the March 1984 note, they notified the court that they would be calling Brakke as a witness at trial and moved to disqualify him and his law firm from continued representation of the Bank. The Wentworths alleged that Brakke would impeach the testimony of the Bank's witnesses regarding the promissory notes and be forced either to admit that he presented a false note to the court or to disavow any knowledge of the March 1984 note that the trial court ultimately concluded was the valid and enforceable note. According to the Wentworths, this situation created a substantial conflict of interest between Brakke and the Bank's officials requiring imputed disqualification of the entire law firm.

Rule 3.7 of the North Dakota Rules of Professional Conduct directs:

LAWYER AS WITNESS

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) The testimony relates to an uncontested issue;

(2) The testimony relates to the nature and value of legal services rendered in the case; or

(3) Disqualification of the lawyer would work substantial hardship on the client because of the distinctive value of the lawyer or the lawyer's firm as counsel in the particular case.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by a conflict of interest.

The comment to this rule explains the basis for disqualification when a conflict of interest exists:

Whether the combination of roles [of advocate and witness] involves improper conflict of interest with respect to the client is determined by the application of the rules concerning conflict of interest, most importantly, Rules 1.7, 1.8, and 1.9. For example, if there is likely to be substantial conflict between the testimony of the client and that of the lawyer or a member of the lawyer's firm, the representation is improper. The problem can arise whether the lawyer is called as a witness on behalf of the client or is called by the opposing party. Determining whether or not such a conflict exists is primarily the responsibility of the lawyer involved. See Comment to Rule 1.7. If a lawyer who is a member of a firm may not act as both advocate and witness by reason of conflict of interest, Rule 1.10 disqualifies the firm also.

■ Therefore, if the conflict rules alone would preclude the testifying lawyer from acting as both advocate and witness, then no one in the testifying lawyer's firm may serve as an advocate in the case. *See Syscon Corp. v. United States,* 10 Cl.Ct. 200, 202–203 (1986). In other words, if the rules on conflict of interest would preclude Brakke from acting as advocate and witness at the trial, it would likewise be improper for Haggart to serve as the Bank's trial counsel. *See Geisler by Geisler v. Wyeth Laboratories,* 716 F.Supp. 520, 525 (D.Kan.1989); C. Wolfram, *Modern Legal Ethics* § 7.6, at p. 395 (1986). Rule 1.10(a) of the North Dakota Rules of Professional Conduct says: "Lawyers associated in a firm may not knowingly represent a client

volve a conflict of interest between the lawyer and client.

The opposing party has proper objection where *the combination of roles may prejudice* that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.

Furthermore, judicial action ordinarily requires that

affidavits [must] be made on personal knowledge; set forth facts that would be admissible in evidence and show affirmatively that the affiant is competent to testify to the matters included in the affidavits [citations omitted]. However, without timely objection, otherwise inadmissible evidence may be considered by the court....

*Williston Co-op. Credit Union v. Fossum,* 427 N.W.2d 804, 806 (N.D.1988). Here, the Wentworths did not object to Brakke's affidavit on hearsay or competency grounds at the hearing on immediate possession.

when any one of them practicing alone would be prohibited from doing so by these rules, ..."

A conflict of interest arises when an attorney's testimony would prejudicially contradict or undermine his client's factual assertions. *See Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir.1989); *Sellers v. Superior Court, Maricopa County*, 154 Ariz. 281, 742 P.2d 292, 299 (Ct.App.1987); Rule 1.7 of the North Dakota Rules of Professional Conduct.[5] Courts have held that when an attorney is to be called other than on behalf of his client, a motion for disqualification must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client. *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 624 P.2d 296, 302 (1981). *See also ABA/BNA Lawyers' Manual on Professional Conduct* 61:507 (1984), and cases collected therein.

■ We also recognize, however, that courts generally view motions to disqualify opposing counsel with extreme caution because disqualification can be used to gain a tactical advantage and to harass the opposing party. *See Thompson v. Goetz*, 455 N.W.2d 580, 587 (N.D.1990); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir.1982). Thus, the showing of prejudice needed to disqualify opposing counsel is more stringent than when the attorney is testifying on behalf of his client because adverse parties may attempt to call opposing lawyers as witnesses simply to disqualify them. *See Greater Rockford*

*Energy & Technology v. Shell Oil Co.*, 777 F.Supp. 690, 693 (D.C.D.Ill.1991); *Jones v. City of Chicago*, 610 F.Supp. 350, 360 n. 3 (D.N.D.Ill.1984). The obvious dangers inherent in allowing a party to call adverse counsel as a witness and the importance of the right to have the counsel of one's choice, *see Goetz,* requires careful scrutiny of the facts before disqualification is compelled. *Security General Life Ins. v. Superior Court,* 149 Ariz. 332, 718 P.2d 985, 988 (1986). The trial court proceeded cautiously here, and properly so.

■ A trial court's decision on a disqualification motion will only be reversed for an abuse of discretion. *Goetz.* Under the circumstances of this case, we do not believe the trial court abused its discretion in refusing to disqualify Brakke's law firm from representing the Bank during trial.

■ Attorney Haggart represented the Bank during trial. Attorney Brakke did not appear at the trial, but parts of his deposition testimony were read into the record by the Wentworths' attorney. Brakke testified that he was not shown the March 1984 installment note when he commenced the action. Rockswold and another Bank officer, Steven D. McLaen, testified at one point that both the December 1984 note and the March 1984 note were evidence of the Wentworths' debt and were valid and enforceable. Brakke denied having made the decision as to which note to sue on. He testified that he worked with Rockswold in preparing to bring the action and that the file information he received from Rockswold did not include the March 1984 note. Rockswold testified that he did not meet or talk to Brakke about the commencement of the collection action.

**5.** The relevant part of Rule 1.7 of the North Dakota Rules of Professional Conduct directs:

CONFLICT OF INTEREST: GENERAL RULE
(a) A lawyer shall not represent a client if the lawyer's ability to consider, recommend, or carry out a course of action on behalf of the client will be adversely affected by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests.
(b) A lawyer shall not represent a client when the lawyer's own interests are likely to adversely affect the representation.

(c) A lawyer shall not represent a client if the representation of that client might be adversely affected by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

McLaen testified, however, that he sent the notes and security agreements to Brakke for commencement of the action. The Wentworths also rely on inconsistent testimony by McLaen regarding whether he was aware of the March 1984 note when the action was commenced.

Brakke's attesting to the validity of the promissory notes created an awkward and confusing situation. But we believe the trial court correctly determined that the testimony was not "in such conflict that a disqualification of the Bank's attorneys would be required." Questions on the validity of the two notes directed to the Bank's officers called for findings and conclusions that were within the province of the trial court. Although discrepancies about which Bank officer sent the notes to Brakke to commence the suit had some impeachment value, it was not compelling considering that this lawsuit was almost five years old at the time of trial. Brakke's testimony on material facts was not so prejudicial to the Bank that imputed disqualification of the law firm was mandated, as a matter of law.

Moreover, the trial court did not allow the Wentworths to amend their complaint to assert an action for fraud on the court, concluding that this was not a compulsory counterclaim.[6] In doing so, the trial court envisioned the possibility that such a disqualification may well be required in a future trial of that action, and cautioned the Bank's attorneys accordingly. See Comment to Rule 3.7 (determining whether conflict exists is primarily the responsibility of lawyer involved).

Although the Wentworths argue that the trial court's failure to allow this amendment to their counterclaim was erroneous, we disagree when considered in conjunction with the motion to disqualify the Bank's attorneys. The trial court considered that this litigation had "been going on for a long period of time" and that to require the Bank to retain new attorneys at such a late date "would undoubtedly work a financial hardship on it." See Goetz, 455 N.W.2d at 588. In its decision to deny the demand for jury trial, the trial court noted that the fraud-on-the-court action "will be heard after the trial." While other dispositions might have been possible, the trial court resolved these problems in a practical, logical, and sensible fashion.

We find no abuse of discretion on this record and conclude that disqualification of Brakke's law firm was not required.

## II

The Wentworths argue that the trial court erred in denying them a jury trial. We disagree.

■■■ Whether a party is entitled to a jury trial depends upon whether the case is an action at law or an action at equity. *First Nat'l Bank and Trust v. Brakken,* 468 N.W.2d 633, 635 (N.D.1991). There is no absolute right to a jury trial in an equitable action, *id.,* although a trial court may submit, in its discretion, factual questions to an advisory jury. *Lithun v. Grand Forks Public School Dist. No. 1,* 307 N.W.2d 545, 549 n. 4 (N.D.1981); *Dobervich v. Central Cass Public School Dist. No. 17,* 283 N.W.2d 187, 190 (N.D.1979); *Bolyea v. First Presbyterian Church of Wilton, N.D.,* 196 N.W.2d 149, 160 (N.D.

---

**6.** "Fraud on the court" has been characterized as "a scheme to interfere with the judicial machinery performing the task of impartial adjudication, as by preventing the opposing party from fairly presenting his case or defense." *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 195 (8th Cir.1976). The term "contemplates conduct so egregious that it undermines the integrity of the judicial process." *Stone v. Stone,* 647 P.2d 582, 586 n. 7 (Alaska 1982). A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel, and must be supported by "clear, unequivocal and convincing evidence." *Pfizer, Inc..* As a specific ground for relief under NDRCivP 60(b), fraud on the court usually results in the setting aside of the judgment. *See generally* Annot., *Construction and Application of Provision of Rule 60(b) of Federal Rules of Civil Procedure that Rule Does not Limit Power of Federal District Court to Set Aside Judgment for "Fraud Upon the Court",* 19 A.L.R.Fed. 761 (1974); *Goetz v. Gunsch,* 80 N.W.2d 548 (N.D.1956); *Rykowsky v. Bentz,* 45 N.D. 499, 178 N.W. 284 (1920); *Yorke v. Yorke,* 3 N.D. 343, 55 N.W. 1095 (1893).

1972); NDRCivP 39(c). The foreclosure of a security interest in a farmer's livestock and equipment is an equitable action triable to the court without a jury. *Production Credit Ass'n v. Rub*, 475 N.W.2d 532, 537–538 (N.D.1991). In an equitable action, a party who raises legal defenses denominated as a counterclaim is not entitled to have a jury trial on those defenses. *Adolph Rub Trust v. Rub*, 474 N.W.2d 73, 75 (N.D.1991). We have ruled before, in *Farm Credit Bank of St. Paul v. Rub*, 481 N.W.2d 451, 458 (N.D.1992), that, even when a counterclaim seeks monetary damages, a party is not entitled to a jury trial if the damage claim is incidental to and dependent upon a primary claim for which a jury trial is not allowed.

■ The Wentworths sought $1,000,000 in damages for conversion, for constructive fraud, and for actual fraud and deceit. They also sought indemnification from the Bank in the event that they were required to pay FmHA the amount paid by FmHA to the Bank on the guarantee. The Wentworths also sought $1,000,000 in exemplary damages.

In their counterclaim for conversion, the Wentworths alleged that the Bank had misapplied payments to loans other than the FmHA guaranteed loan and that this action caused the default on the guaranteed loan, leading to the illegal seizure of their livestock and machinery. The counterclaims for constructive fraud, actual fraud, and deceit alleged that the Bank misapplied loan payments, that the Bank fraudulently induced them into executing the December 1984 note, and that the Bank falsely represented to FmHA that the guaranteed note was in default so that FmHA would authorize liquidation. These acts also allegedly resulted in the unlawful seizure of the Wentworths' livestock and machinery.

These counterclaims are not independent claims but are, in effect, legal defenses to the foreclosure action. Each counterclaim, if proven, would constitute a defense to the Bank's foreclosure action. Likewise, the indemnification claim is only incidental to the defenses against the debt because if the Wentworths successfully defended the Bank's claim, there would be no need for indemnification.

Although the Wentworths seek money damages in their counterclaims, these damages are merely incidental to the defenses and arise out of the seizure of collateral that took place as part of the Bank's main foreclosure action. *See Brakken*, 468 N.W.2d at 636; *Production Credit Ass'n v. Rub*, 475 N.W.2d at 538. The Wentworths' counterclaims were incidental to and dependent upon a primary claim that did not entitle them to a jury trial. Therefore, the Wentworths were not entitled to a jury trial in this case.

### III

The Wentworths assert that the $225,000 debt evidenced by the March 1984 note must be discharged because it was fraudulently altered in violation of NDCC 41–03–44. However, there is evidence which, if believed, supports the trial court's contrary findings on this question.

■ A party's liability on an instrument is discharged if the holder's alteration of the instrument is both material and fraudulent. NDCC 41–03–44(2)(a) says:

As against any person other than a subsequent holder in due course:

a. Alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;

...

A material alteration is defined in NDCC 41–03–44(1):

Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in:

a. The number or relations of the parties;

b. An incomplete instrument, by completing it otherwise than as authorized; or

c. The writing as signed, by adding to it or by removing any part of it.

■ The question whether an instrument has been materially and fraudulently

altered is one of fact, governed by NDRCivP 52(a). *First National Bank, Hettinger v. Robertson,* 442 N.W.2d 430, 431 (N.D.1989). A finding of fact is clearly erroneous when there is no evidence to support it, or when, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.*

The trial court found that the "Bank at no time made any material or other alteration of any negotiable instrument." The Wentworths assert that when Rockswold had John Wentworth execute the December 1984 single-payment note, this materially and fraudulently altered the terms of the March 1984 installment note. We are unable to accept this argument for two reasons.

First, there is no indication in the record that a negotiable instrument, *see* NDCC 41–03–02(1)(a) and 41–03–04, was physically altered in any manner. *Compare Liberty State Bank v. Hemisphere,* 98 Mich.App. 285, 296 N.W.2d 241, 243 (1980) (borrower's account ledger card, which bank altered, was not an instrument that, if materially and fraudulently altered, would discharge borrower's obligations). The cases relied on by the Wentworths, *Robertson* and *Stevens v. Barnes,* 43 N.D. 483, 175 N.W. 709 (1919), do not support the idea that this transaction was a physical alteration. In *Robertson,* after a note had been signed by two of three debtors, the bank inserted on the face of the note the dates of three security agreements that had been executed to secure various other promissory notes, all of which had previously been paid in full. *Barnes* did not construe the same statute and, in any event, the case involved a physical separation of an order and note. The two notes here were never part of the same document and were not executed at the same time.

Second, assuming that execution of the December 1984 note materially altered the March 1984 note for purposes of NDCC 41–03–44, no discharge resulted unless the alteration was fraudulent. For purposes of NDCC 41–03–44, fraud " 'requir[es] a dishonest and deceitful purpose to acquire more than one was entitled to under the note as signed by the makers rather than only a misguided purpose.' " *Robertson,* 442 N.W.2d at 432 (quoting *Thomas v. Osborn,* 13 Wash.App. 371, 536 P.2d 8, 13 (1975)). Here, the trial court found that the Bank "at no time intended to deceive, mislead or defraud" the Wentworths by holding the two parallel notes. In the next section, we conclude that there is evidence that supports this finding, if believed.

On this record, we conclude that NDCC 41–03–44 did not discharge the Wentworths from their obligations under the March 1984 note.

## IV

The Wentworths argue that the trial court erred in failing to find the Bank guilty of fraud, deceit, and conversion.

Fraud and deceit are treated as questions of fact, and the trial court's determination on those matters will not be set aside on appeal unless clearly erroneous. *Brakken,* 468 N.W.2d at 636. Likewise, whether conversion of another's property occurred is a question for the trier of fact. *See Napoleon Livestock Auction, Inc. v. Rohrich,* 406 N.W.2d 346, 351 (N.D.1987).

According to the Wentworths, the Bank engaged in an extensive course of fraud, conversion, and deceit designed to maximize its gain on the operating loans, and then to collect on the FmHA guaranteed note. They assert that the Bank's failure to mark the December 1983 note and the February 1984 note "renewed" when John Wentworth executed the March 1984 note was not only fraudulent, but a criminal act under NDCC 41–03–80.[7] The Wentworths as-

---

7. NDCC 41–03–80 says:

*Renewal of promissory note—Cancellation and return of renewed note or marking thereof— Penalty.* No person, firm, or corporation, or state or national bank doing business in this state, shall take from any debtor or other person or concern obligated upon a negotiable promissory note or other negotiable obligation, any renewal thereof without, at the time, either:

sert that fraud and deceit exist in this case because the Bank kept two sets of promissory notes for the same debt that was ultimately guaranteed by FmHA, and the "true debt contract," the March 1984 installment note, was "neither entered in the Bank's books in any fashion nor ever considered by [the] Bank as part of its contract with Wentworths." They argue that the December 1984 single-payment, 15-month note was executed "to perpetuate the Bank's 'double set' of financial records which made it appear Wentworths had only short term debt obligations with the Bank." They further argue that the Bank made other fraudulent misrepresentations to FmHA and converted their payments by applying them to operating loans "to artificially create a default on the FmHA note, thus obtaining FmHA approval for the seizure and liquidation of the Wentworths' collateral." They argue that the Bank improperly arranged for a private sale of collateral by fraudulently representing to FmHA that the Wentworths were "militant farm radicals" and that a public auction would result in "trouble." All of these actions by the Bank, according to the Wentworths, constituted a grand scheme to defraud them of all that they owned.

■ Fraud is never presumed, but must be proved by evidence that is clear, satisfactory, and convincing. *Buehner v. Hoeven*, 228 N.W.2d 893, 903 (N.D.1975). However, inducement and reliance may be inferred when there is nondisclosure of a material fact. *Adams v. Little Missouri Minerals Association*, 143 N.W.2d 659, 683 (N.D.1966). While the Wentworths' allegations and theory of the case could support findings of fraud and deceit on the part of the Bank, the Bank presented evidence that

dressed its actions in innocence and rebutted these allegations of fraud and deceit relied upon by the Wentworths.

The Bank explained that at the time the possibility of a FmHA loan guarantee was discussed in early 1984, the Wentworths owed principal of $225,000 plus accrued interest, while the value of the livestock and machinery collateral was estimated to be $290,000, leaving approximately $60,000 in equity between the debt and the value of the collateral. The Bank's lending limit per customer at the time was $225,000. The Bank contended that it did not seek the FmHA guarantee solely to improve its own position, but only to enable the Wentworths to borrow the money they needed to continue to operate their farm and ranch.

■ Rockswold contended that he had no experience with farm loan guarantees, and that this was one of the first guarantees handled by the Sargent County FmHA office. Bank officers explained that, when the March 1984 note was executed and the Wentworths were unable to pay the interest owed on the December 1983 and February 1984 notes, the Bank's computer accounting service could not handle the new variable-rate, multiple-maturity note, so the Bank did not put the March 1984 note on its books, but placed it in the back of its file. According to the Bank, once FmHA approved the guarantee, the Bank loaned operating money to the Wentworths.

Furthermore, the Bank alleged that nothing was concealed from the Wentworths because John Wentworth signed the notes. According to the Bank, on December 17, 1984, John knew that he owed principal, knew the interest rates of the earlier notes, and knew the amount of the $208,177.37 note that he signed on that date. One of

1. Canceling and returning to the maker of the renewal the original obligation so renewed; or
2. Marking or causing to be marked across the face of the renewed instrument in legible writing in ink, or to be typewritten thereon, the word "renewed" or words of like import and effect.
Any person, firm, corporation, or bank taking any such renewal note or contract without complying with the provisions of this section shall be liable to any person or concern for all

loss or damage suffered thereby, and if the failure so to comply was intentional, shall be guilty of a class A misdemeanor.
The trial court ruled that, although the Bank "may have unintentionally violated" this statute, the holding of parallel notes in this case did not increase, alter, or affect the amount of debt owed to the Bank, did not cause or create any default, did not affect the Bank's right to repossession of collateral following default, and did not cause the Wentworths any harm.

the Bank's experts testified that it was appropriate for the Bank to apply the calf sale proceeds to the interest and the remainder to the principal because the interest was owed and the underlying debt was the debt guaranteed. The Bank argued that the December 1984 note referred to the FmHA guarantee, and that Wentworth acknowledged that he was told by Rockswold that the March 1984 note did not fit into the Bank's computer and that the December 1984 note was for "in-house banking" purposes to track the money.

Rockswold testified that he intended to renew the loan until March 6, 1986, when he would expect another payment of $52,476.38, and that he did not expect to have the whole note come due on that date. According to Bank officers, a single-payment, 15–month note was used because that was how all of the Bank's term loans were handled at the time. The trial court's finding, that although the December 1984 note was a single-payment, 15–month note, the Bank and the Wentworths understood that an installment payment of only $52,476.38 would be due on March 6, 1986, is supported by the Bank's version of the facts.

Although the Bank initially sued in May 1987 to foreclose on the 15 promissory notes on its books, including the December 1984 note that the trial court concluded was unenforceable, the Bank argued that it would still have been entitled to immediate possession had it originally sued on the March 1984 note, because that note was also in default. The Wentworths had failed to pay the installment due on March 6, 1986, and their payment was applied to the outstanding operating loan. Even if the calf proceeds had been applied to the guaranteed note, that payment was minimally insufficient to meet the called-for installment, the Bank contended. According to the Bank, the resulting failure to pay the operating loan would then have caused a default under the terms of the guaranteed note because the default and acceleration clause in the March 1984 note declared:

> The Borrower shall be in default upon the occurrence of any one or more of any of the following events: (1) the Borrower shall fail to pay, when due, any amount required hereunder, or any other indebtedness of the Borrower to the Lender o[r] any third parties; ...

Although the lender's agreement required that the Bank apply the proceeds from the sale of collateral in accordance with the lien priorities on which the guarantee was based, the Bank's FmHA expert testified that the calf proceeds could be applied to operating loans in accordance with the lien priorities. The local FmHA officer involved in this case also testified that calf income can ordinarily be applied to payment of loans for operating expenses even if there is a scheduled payment due on a guaranteed loan.[8]

8. *Compare* NDCC 9–12–07:
*Performance when there are several obligations—Application.* When a debtor under several obligations to another does an act by way of performance, in whole or in part, which is applicable equally to two or more of such obligations, such performance must be applied as follows:
1. If, at the time of the performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation is manifested to the creditor, it must be applied in such manner.
2. If no such application is then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation the performance of which was due to him from the debtor at the time of such performance, except that if similar obligations were due to him both individually and as a trustee, unless otherwise directed by the debtor, he shall apply the performance to the extinction of all such obligations in equal proportion. An application once made by the creditor cannot be rescinded without the consent of the debtor.
3. If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order, and if there is more than one obligation of a particular class, to the extinction of all in that class ratably.
a. Of interest due at the time of the performance.
b. Of principal due at the time of performance.
c. Of the obligation earliest in date of maturity.
d. Of an obligation not secured by a lien or collateral undertaking.

The Bank presented evidence which, if believed, tended to show that it did not create the default on the guaranteed note, but that the default occurred because the Wentworths did not have enough money to make all of their debt payments.

Also, in order to support a legal action or defense, fraud and deceit must have produced actual damages. *Olson v. Fraase,* 421 N.W.2d 820, 827 (N.D.1988). While the trial court found that it was improper for the Bank to have concurrent notes for the same debt, the court also found that this impropriety did not cause any loss or damage to the Wentworths. The Wentworths' own banking expert was not aware of any damage sustained by the Wentworths as a result of the Bank's holding parallel notes, other than "confusion." [9]

We have examined the conflicting evidence in the record. The evidence presented by the Bank, if believed, supports the trial court's finding that the Bank did not commit fraud, deceit, or conversion in its dealings with the Wentworths.

### V

The Wentworths assert that Judge Eckert's failure to either disclose to them that he was being represented by attorney Kermit Bye, a member of the Bank's law firm, in an unrelated matter at the time of the commencement of these proceedings or, on his own motion, to disqualify himself from presiding over this case, requires reversal of the judgment. Under the unique circumstances of this case, we agree.

The Rules of Judicial Conduct direct a judge's decisions on disqualification. Rule 2 demands that "[a] judge shall avoid impropriety and the appearance of impropriety in all his activities." Rule 2(A) thus directs that "[a] judge shall respect and comply with the law and shall act in such a manner that promotes public confidence in the integrity and impartiality of the judiciary." Rule 3(C)(1)(a) makes a judge's disqualification "appropriate when the judge's impartiality might reasonably be questioned."

The disqualification directions in Rule 3(C) are not merely guidelines; they are mandatory. *Matter of Estate of Risovi,* 429 N.W.2d 404, 407 (N.D.1988). Our primary concern is the preservation of public respect and confidence in the integrity of the judicial system, which "can only be maintained if justice satisfies the appearance of justice." *Baier v. Hampton,* 440 N.W.2d 712, 715 (N.D.1989). Even without intentional bias, disqualification can be es-

---

e. Of an obligation secured by a lien or collateral undertaking.

Although the Wentworths assert that the Bank misapplied payments in this case, NDCC 9–12–07 applies only when the payment is tendered by the debtor voluntarily. *See State Bank of Streeter v. Nester,* 385 N.W.2d 95, 97 (N.D.1986). Because the funds acquired by the Wentworths from the sale of calves constituted proceeds from the sale of secured property under one of the Bank's security agreements, it is not clear whether NDCC 9–12–07 applies here. *See Gallatin Trust & Savings Bank v. Darrah,* 153 Mont. 228, 456 P.2d 288, 289 (1969) (construing statutes identical to NDCC 9–12–07). Even if NDCC 9–12–07 applies under these circumstances, the remedy for a violation of the statute is to treat the incorrectly applied payment as having been applied as directed. *See Hagen v. Dwyer,* 36 N.D. 346, 162 N.W. 699, 701 (1917). The trial court agreed with the Bank that applying the calf proceeds as the Wentworths directed would still have resulted in a default under the terms of the guaranteed note.

The trial court also found that:

In 1985 and 1986 the Wentworths sold machinery, had sales of cull cows and bulls together with two substantial calf sales. If the proceeds had been applied to the 1985 or 1986 payments due on the guaranteed loan (Plaintiff's Exhibit 5), the payments would have exceeded the two installments due on March 6, 1985 and March 6, 1986. This would have meant, however, less money for the operating loans and the Bank would not have advanced money for operating loans after the initial calf sale of December 17, 1984. In 1985 the Bank continued to lend the Wentworths operating money on a regular basis. Without the operating loans the Wentworths would have been unable to continue ranching and farming.

There is evidence in the record that, if believed, supports this finding.

9. Furthermore, a renewed but unmarked note is only uncollectible if the bank is unable to "surrender all notes taken in renewal thereof" or unwilling to satisfactorily indemnify the maker "against liability thereon." NDCC 41–03–81. It is arguable that the Wentworths proved no loss.

sential to satisfy the appearance of justice. *Id.*

Because it may appear to a reasonable person that the judge's conduct of a trial might not be impartial when one of the attorneys is, even as the trial is being held, representing the judge in another matter, courts have held that disqualification should be required under these circumstances. *See Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir. 1980); *Texaco, Inc. v. Chandler,* 354 F.2d 655 (10th Cir.1965); *DeCamp v. Good Samaritan Hospital,* 66 A.D.2d 766, 410 N.Y.S.2d 671 (1978); *Reilly by Reilly v. Southeastern Pa. Transp.,* 330 Pa.Super. 420, 479 A.2d 973 (1984). The inquiry here is whether a reasonable person could, on the basis of objective facts, reasonably question Judge Eckert's impartiality.

William S. Williams, an attorney, commenced an action along with several others in May 1986 shortly after he had been suspended from the practice of law. Williams named 20 defendants in the action, including the State, Vivian Berg and the Disciplinary Board of the Supreme Court, Agriculture Commissioner Sarah Vogel, Attorney General Nicholas Spaeth, the State Bar Association of North Dakota (SBAND), several attorneys involved in the disciplinary process, several attorneys who represented creditors, attorney Brakke, and Judge Eckert. Attorney Bye appeared on behalf of Judge Eckert. Other members of that law firm represented attorney Brakke and SBAND. According to *Williams v. State,* 405 N.W.2d 615, 619 (N.D.1987), on July 22, 1986, the trial court in that case dismissed the complaint with prejudice and ordered sanctions against the plaintiffs because " 'the pleadings filed by all of the Plaintiffs in this action were frivolous and presented such a complete absence of actual facts or law that a reasonable person could not have thought this Court would render judgment in the Plaintiffs' favor.' "

Williams appealed from that order, as well as from an August 26, 1986 order declaring that the plaintiffs' attempt to remove the case to federal court was null and void. Only the attorney general's office, on behalf of the state defendants, provided oral argument on appeal. Counsel for the other defendants, including Judge Eckert, joined in the brief submitted by the assistant attorney general under NDRAppP 28(i). *Id.* at 625 n. 14. This court dismissed the appeal from the August 26, 1986 order because it had become moot. *Id.* at 617. Noting that "the complaint is so amorphous and vague that it is difficult to discern exactly what the plaintiffs' claim is," we ruled that the complaint and other pleadings were "so devoid of either facts or law that a reasonable person could not expect a favorable judgment on them." *Id.* at 623. We affirmed the trial court's July 22, 1986 order, concluding not only that the trial court acted within its discretion in entering sanctions, but that sanctions were "mandated" under the circumstances. *Id.* at 624. Because the appeal was so "flagrantly groundless," we awarded double costs and reasonable attorney fees for the amounts expended by the assistant attorney general in defending the state defendants. *Id.* at 625. We remanded to the district court with instructions "to determine and enforce the payment of costs and attorneys' fees." *Id.* at 626. *Williams* was decided by this court on May 4, 1987, approximately four weeks before Judge Eckert presided over the hearing to determine whether the Bank was entitled to immediate possession of the Wentworths' collateral.

However, another order had been entered in the *Williams* litigation. In this October 23, 1986 order, the trial court entered sanctions against 27 of the plaintiffs in the amount of $10,209.34, awarded injunctive relief against two of the plaintiffs, and ordered that any plaintiff who filed a notice of appeal from that order was required to file a bond for costs on appeal with the district court in the amount of $2,000 for each appellant. Seven of the plaintiffs appealed, but did not file appeal bonds or briefs on the merits. Almost nine months after the plaintiffs' briefs were due, the assistant attorney general moved in September 1987 to dismiss the appeal. Attorney Bye, on behalf of Judge Eckert,

joined in the motion and submitted a supplemental brief in support of the motion. On October 7, 1987, we summarily dismissed the appeal in an unpublished order.

In March 1988, a judgment for $9,199.92 was entered in favor of the state defendants, who were represented by the assistant attorney general, against 15 of the plaintiffs. This judgment did not award anything to Judge Eckert.

The *Williams* litigation was nothing more than a nuisance lawsuit and is a veritable definition of frivolity for purposes of NDCC 28–26–01, NDRCivP 11, and NDRAppP 38 sanctions in this jurisdiction. The major portion of the lawsuit, with regard to the defendants who were not represented by the attorney general's office, had been completed prior to the June 1, 1987 hearing on the Bank's entitlement to immediate possession of the Wentworths' collateral. The *Williams* plaintiffs had essentially abandoned their appeal from the October 23, 1986 order. Obtaining dismissal of that appeal was an insignificant part of putting that lawsuit to rest. Attorney Bye did not appear before Judge Eckert in the Wentworth proceedings. The actual trial of the main foreclosure action against the Wentworths did not occur until October 1991, long after the *Williams* litigation had been completed. Our review of the voluminous record compiled in this case reveals no hint of actual bias on the part of Judge Eckert.[10] Rather, the record reveals that Judge Eckert exercised meticulous consideration of all of his rulings in these proceedings.

If this case had been an ordinary, uncomplicated, and straight forward foreclosure action, or if the case had been submitted to a jury, we would have no difficulty in concluding that a reasonable person would not have reasonably questioned Judge Eckert's impartiality, and that disqualification was not required. *See, e.g., Desnick v. Mast*, 311 Minn. 356, 249 N.W.2d 878, 882–883 (1976). However, this was hardly an ordinary foreclosure action. Rather, the credibility of the parties was crucial in resolving this litigation.

The Bank's handling of its credit relationship with the Wentworths was, at best, bumbling and clumsy. At worst, it raises inferences of fraud, deceit, illegality and other improprieties. The Bank failed to mark promissory notes "renewed" when they were replaced by another promissory note. The Bank improperly held two parallel promissory notes representing the same debt. The Bank applied loan payments contrary to the instructions of the Wentworths. The Bank's attorney, Brakke, who was Judge Eckert's codefendant in *Williams*, attested to the validity of an invalid promissory note in these proceedings.

Despite these difficulties, Judge Eckert ruled in favor of the Bank, adopting virtually all of its explanations for its actions and reasoning that these actions caused the Wentworths no harm. Although Judge Eckert's findings are supported by some of the evidence in the record, there is conflicting evidence that could also support contrary findings on many of the factual questions.

Because Judge Eckert had been represented by the Bank's law firm during the initial proceedings for immediate possession of the collateral, a reasonable person could reasonably question Judge Eckert's impartiality in accepting the Bank's version of the facts over the Wentworths' version of the facts.

Given the nature of this complicated foreclosure action and Judge Eckert's unintentional entanglement with Brakke and his law firm through the *Williams* litigation, we must conclude that a reasonable person could, on the basis of these objective facts, reasonably question Judge Eckert's impartiality, and that disqualification was required.

 A violation of the Rules of Judicial Conduct by the judge who presides over a case can result in the reversal of a

---

**10.** The Wentworths' assertion that Judge Eckert had "prejudged the merits" of their case is without merit. A disagreement on legal questions does not evidence bias. *See Ireland's Lumber Yard v. Progressive Contractors*, 122 N.W.2d 554, 562 (N.D.1963).

judgment. *Baier; Matter of Estate of Risovi.* This can occur even when the judge has no actual knowledge of, or inadvertently overlooks, a disqualifying circumstance. *See Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Judge Eckert's conduct did not show any intentionally unethical behavior, nor can any be implied in view of the frivolity of the *Williams* litigation. Rather, the record shows beyond question that Judge Eckert fairly tried this case. Nevertheless, the appearance of impropriety is so important to our judicial system that, in the interests of justice, reversal of a judgment may be required even without any intentional bias or impropriety. *See Baier; Matter of Estate of Risovi; see also Liljeberg,* 486 U.S. at 864, 108 S.Ct. at 2205 [for a violation of 28 U.S.C. § 455(a), which requires disqualification when a judge's impartiality might reasonably be questioned, "it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process"]. We conclude that this is such a case.

We have not directly applied the *Liljeberg* test in this case, which is a direct appeal from a judgment, even though there is no trial court record of the facts involving the disqualification issue, and we have had to take judicial notice of the facts in *Williams. See* NDREv 201. Nevertheless, it may be appropriate to consider adopting the Supreme Court's formulation of the *Liljeberg* test in possible future cases. Even if we were to apply the *Liljeberg* test in this case, the result would be the same because of the peculiarities of this case and not because of any intentional misconduct on the part of Judge Eckert.

Accordingly, we reverse the judgment and remand for a new trial before a different trial judge to be designated.

VANDE WALLE, C.J., and RALPH J. ERICKSTAD, VERNON R. PEDERSON and BERT L. WILSON, Surrogate Judges, concur.

Surrogate Judge RALPH J. ERICKSTAD was Chief Justice at the time this case was heard and served as surrogate judge for this case pursuant to NDCC 27–17–03.

BERT L. WILSON and VERNON R. PEDERSON, Surrogate Judges, sitting in place of LEVINE and JOHNSON, JJ., disqualified, who was a member of the Court when this case was heard.

Justice NEUMANN and Justice SANDSTROM, not being members of the Court when this case was heard, did not participate in this decision.

VERNON R. PEDERSON, Surrogate Judge, concurring specially.

The opinion authored by Justice Meschke is thoughtful and scholarly and has convinced me that there are some valid justifications for a reversal of the judgment. I am convinced that I should join in that opinion but I am equally convinced that I am left with a few unanswered bothersome questions.

I start with the basic premise that "when you borrow, you have to repay." Psalms, Chapter 37–Verse 21; Proverbs, Chapter 3–Verses 27 and 28; and Proverbs, Chapter 22–Verse 7, all seem to tell me that. Does a lender have to proceed with exactitude and be somehow "otherwise qualified" to collect when payments are overdue? What kinds of errors by the court will hereafter be held to be alterations of the basic premise? A fair trial is the usual standard, especially in criminal practice; since when are civil litigants entitled to a "perfect trial"? Is the cure in farm foreclosure cases more onerous than the disease? Or, does a hollow victory make it all worthwhile? Finally, are we not merely dangling a mythical carrot before the debtors, inviting them to battle on for an ultimate, costly, and certain defeat at the end?