**SARGENT COUNTY BANK,**
Plaintiff and Appellee,

v.

John WENTWORTH and Beth
R. Wentworth, Defendants
and Appellants.

John WENTWORTH and Beth
R. Wentworth, Plaintiffs
and Appellants,

v.

**SARGENT COUNTY BANK,**
Defendant and Appellee.

Civ. Nos. 950263, 950264.

Supreme Court of North Dakota.

May 29, 1996.

Rehearing Denied June 27, 1996.

and John and Beth Wentworth, we affirm a judgment foreclosing the Bank's security interests in the Wentworths' property, and a judgment dismissing the Wentworths' claims against the Bank.

In *Sargent County Bank v. Wentworth,* 434 N.W.2d 562 (N.D.1989) (*Wentworth I*), we dismissed, for lack of appealability, the Wentworths' appeal from an order granting the Bank prejudgment possession of collateral in its pending foreclosure action against the Wentworths. In *Sargent County Bank v. Wentworth,* 500 N.W.2d 862 (N.D.1993) (*Wentworth II*), we ruled the evidence was sufficient to uphold the trial court's findings that the Bank had not committed fraud, deceit or conversion in its financial dealings with the Wentworths but, nevertheless, we reversed a foreclosure deficiency judgment for the Bank because the judge had not disclosed he was being represented by a member of the Bank's law firm in an unrelated legal matter when he granted the order for prejudgment possession. Even though the judge's conduct did not reveal any intentionally unethical behavior and the record reflected he had fairly tried the case, we remanded for a new trial before another judge to avoid any appearance of impropriety. After a lengthy retrial, the other judge also found the Bank did not commit fraud, deceit or conversion in its financial dealings with the Wentworths, granted the Bank foreclosure of its security interests, but denied the Bank a deficiency judgment because its sale of the collateral was not reasonably conducted. The Wentworths appealed.

W. Todd Haggart (argued), of Vogel, Kelly, Knutson, Weir, Bye & Hunke, Ltd., Fargo, for plaintiff, defendant and appellee Sargent County Bank. Appearances by Steve McLaen and D. Dean Rockswold of Sargent County Bank.

James J. Coles (argued), of Snyder Coles Lawyers, Bismarck, for defendants, plaintiffs and appellants John and Beth R. Wentworth. Appearances by Robert J. Snyder and John Wentworth.

MESCHKE, Justice.

In this third appeal during nearly a decade of litigation between Sargent County Bank

I

The trial court found the facts to be much the same as those the judge found in *Wentworth II*. We refer the reader to that opinion for more background about this case, and state here only those details necessary for this decision.

The Wentworths operated a farm and ranch in Sargent County and obtained numerous loans from the Bank during the 1980s. The promissory notes and related security agreements are described in *Wentworth II*, 500 N.W.2d at 864 n. 1, and 865 n.

2. By early 1984, the Wentworths owed the Bank $225,000 based on a $200,000 promissory note dated December 5, 1983, and a $25,000 promissory note dated February 24, 1984. The Wentworths needed additional financing for 1984, but the Bank's lending limit then was $225,000 per customer. D. Dean Rockswold, the Bank's vice-president, suggested a Farmers Home Administration (FmHA) loan guarantee to the Wentworths because the amount of the guarantee would not count for the Bank's lending limit, and thus it would enable the Bank to continue financing the Wentworths. The Bank had never before applied for an FmHA guarantee, and the local FmHA office was similarly inexperienced in the loan guarantee process.

On March 6, 1984, John Wentworth signed a $225,000 promissory note covering the same debts represented by the December 1983 and February 1984 notes. FmHA guaranteed 90 percent of this note. The interest rate was variable, and the note was payable in seven annual installments of $52,476.38 each, with the first installment due on March 6, 1985. As primary security to FmHA for the loan guarantee, the Bank designated 200 of the Wentworths' stock cows and six bulls valued at $120,000 and farm equipment valued at $212,500, part of the collateral covered by Wentworths' security agreements to the Bank.

Because the Wentworths were unable to pay the accrued interest owing on the December 1983 and February 1984 notes, the Bank did not mark those notes "renewed." The Bank also did not enter the March 1984 note on its books. The Bank kept track of the interest and payments made on the $225,000 debt by keeping the December 1983 and February 1984 notes on its books.

In early December 1984, the Wentworths sold 177 calves for $43,801.50 and gave the proceeds to the Bank. John Wentworth understood these proceeds would be applied entirely to the first installment payable on the March 1984 note. Instead, the Bank applied the proceeds to the interest due on the December 1983 and February 1984 notes, without informing either the Wentworths or FmHA, and applied the balance to the principal owing on the $225,000 debt.

John Wentworth told the Bank he would have no additional income to apply to the $52,476.38 installment due March 6, 1985, leaving an $8,674.88 shortfall on that installment. The Bank, FmHA and the Wentworths agreed to defer collection of the balance of that installment.

On December 17, 1984, John Wentworth signed a single-maturity, 15–month note in the principal amount of $208,177.37, reflecting the amount of the principal payment made on the $225,000 debt. On that date, the Bank marked the December 1983 and February 1984 notes "renewed." The December 1984 note said "FHA 90% Guaranteed Loan on livestock and equipment" and set forth a variable interest rate, listed as 14 percent on that date, the same rate then in effect for the March 1984 note. The December 1984 note was used thereafter to keep track of the interest and payments on the Bank's books, but the March 1984 note was not marked "renewed."

By December 16, 1985, the Bank had made $148,700 in additional operating loans to the Wentworths, and the Wentworths had repaid only $42,300. The unpaid balance was combined in a renewal note for $106,400, due March 6, 1986. This operating debt carryover was the largest the Wentworths had experienced. Although the Bank loaned the Wentworths funds for living expenses and for planting and harvesting a 1986 crop, they did not establish an operating budget for that crop year.

During March 1985 and March 1986, the Wentworths sold cull cows and turned the proceeds over to the Bank. The Bank applied those proceeds directly to the principal on the guaranteed loan, rather than to the annual installment payment called for by the March 1984 note. By April 20, 1986, the Wentworths' past-due operating debt to the Bank was $143,095.03, and they owed a past due March 6, 1986 installment payment of $52,476.38 on the guaranteed loan. The Wentworths sold their 1985 calf crop for $52,128.48 and received $7,596.91 from the sale of grain. John Wentworth turned these proceeds over to the Bank and requested the $52,128.48 in calf sale proceeds be applied by the Bank to the delinquent installment pay-

ment due on the guaranteed loan. The Bank instead applied those proceeds to the past due operating debt. The Wentworths did not make the March 6, 1986 installment payment on the FmHA guaranteed loan, and they made no other payments on that debt.

The Wentworths and the Bank worked with a farm counselor to prepare a proposal for restructuring the debts, but the proposal was rejected by FmHA. Afterward, the Bank made three additional loans to the Wentworths, totaling over $19,000, and released $6,323.59 in government payments to them, principally for living and harvesting expenses. FmHA approved the Bank's plan for liquidation of the Wentworths' collateral in May 1987. FmHA and the Bank eventually agreed to a settlement on the guaranty.

The Bank sued the Wentworths to foreclose on the farm equipment, livestock, crops and proceeds securing the notes, and sought a deficiency judgment. The Bank also sought an order for immediate possession of the collateral, and supported its request with an affidavit by the Bank's attorney attesting to the validity of the promissory notes. In July 1987, the court granted the Bank immediate possession of the collateral that the Bank sold in late 1988. Neither the Bank nor its attorney disclosed the existence of the March 1984 note to the court before the court issued the order granting the Bank immediate possession.

The Wentworths counterclaimed against the Bank for actual and constructive fraud, deceit, conversion and fraud on the court. They sought compensatory and punitive damages. While the appeal in *Wentworth II* was pending, the Wentworths sued the Bank separately, also claiming conversion and fraud on the court and again seeking compensatory and punitive damages. On remand, this trial judge consolidated the independent action and the original action for trial.

Like the trial judge in *Wentworth II*, the judge here found the Bank committed no fraud, deceit or conversion in its dealings with the Wentworths and granted the Bank foreclosure of its security interest in the Wentworths' collateral. However, finding the Bank's sale of the collateral had not been commercially reasonable, this judge refused to grant the Bank a deficiency judgment. The judge also dismissed the Wentworths' independent action against the Bank.

## II

■ The Wentworths challenge on several grounds the trial court's ruling that the Bank was entitled to collect on the December 1984 promissory note. We reject those arguments.

### A

The Wentworths assert the December 1984 note was invalid because it contained no discernable interest rate and was therefore not negotiable under the law then in effect. The note listed the rate as variable, and Bank officers testified they used the interest rate stated in the March 1984 note to calculate the interest owing on the December 1984 note.

■ Before 1991, "[a]ny writing to be a negotiable instrument within this chapter must ... [c]ontain an unconditional promise or order to pay a sum certain in money...." NDCC 41–03–04(1)(b) (UCC 3–104). A "sum certain" under former NDCC 41–03–06(1)(a) (UCC 3–106) was defined as payable "even though it is to be paid ... [w]ith stated interest...." But, while an obligation secured by a mortgage must be valid and supported by consideration, the obligation need not meet the UCC's exacting standards of negotiability to be enforceable. *Production Credit Ass'n v. Obrigewitch*, 462 N.W.2d 115, 117 (N.D.1990). Thus, a note secured by a mortgage need not be a negotiable instrument under the UCC to be enforceable between the parties to the transaction. *See E.E.E., Inc. v. Hanson*, 318 N.W.2d 101, 106 (N.D.1982); *Sanden v. Hanson*, 201 N.W.2d 404, 408 (N.D.1972). The alleged lack of negotiability of the December 1984 note did not affect its enforceability between the parties.

### B

■ The Wentworths assert there was no consideration given for John Wentworth's execution of the December 1984 promissory

note. They recognize that good consideration for a contract may consist of a benefit to the promisor or a detriment to the promisee, and that renewing past due loans is a sufficient detriment to the promisee. *See, e.g., First Nat'l Bank & Trust v. Brakken,* 468 N.W.2d 633, 638 (N.D.1991). Rather, they rely on Rockswold's testimony that the consideration given for the December 1984 note was renewal of the December 1983 and February 1984 notes. Because the earlier notes had already been renewed by the March 1984 note, the Wentworths argue, there could be no consideration for the December 1984 note. The trial court ruled the December 1984 note "effectively renewed" the March 1984 note. Because of this, the Wentworths argue the March 1984 note cannot be enforced because it was renewed, and the December 1984 note cannot be enforced because it was induced by fraud. We disagree.

We believe the Wentworths received consideration for the December 1984 note because the Bank agreed to defer collection of the balance of the March 1985 payment. More importantly, at the conclusion of trial, the court granted the Bank's motion to amend its complaint to conform to the evidence and to allege the guaranteed debt was owed by the Wentworths based on John Wentworth's admission the debt was owed to the Bank and on the December 1983 and February 1984 notes, as well as the March 1984 or December 1984 notes. John Wentworth admitted that he owed the sum of $225,000 plus accrued interest on March 6, 1984. He further testified the March 1984 note set forth their contract for the guaranteed debt. We conclude the trial court fairly interpreted the December 1984 note consistent with the terms of the March 1984 note and properly concluded the Bank could collect on either note so long as there was no double recovery.

■ Under NDCC 41–03–80, a bank that fails to mark "renewed" on a canceled instrument "shall be liable to any person or concern for all loss or damage suffered thereby...." Furthermore, under NDCC 41–03–81, a renewed but unmarked note is only uncollectible if the bank is unable to "surrender all notes taken in renewal thereof" or is unwilling to indemnify the maker "against liability thereon." These statutes are obviously intended to prevent more than one recovery on a single debt.

The trial court found that, although it was improper for the Bank to hold concurrent or parallel notes representing the same debt, the Bank never sold or transferred any of the notes to third parties, never attempted to collect the debt more than once, and never carried more indebtedness on its books than was actually owed by the Wentworths. The court also found the Bank had surrendered all notes representing the debt owed by the Wentworths, and since the notes have been in the possession of the court, concluded there was no possibility of their sale that might expose Wentworths to multiple liability. All of the notes contained clauses making a default under any of them a default under every other note. The Wentworths were clearly in default because they simply did not have enough money to make all of their debt payments. *See Wentworth II,* 500 N.W.2d at 877. The Wentworths have not proven that the Bank sought to collect more than was due on the Wentworth's debt to the Bank.

There was consideration for both the March 1984 and December 1984 notes. The Bank renewed the debt represented by the December 1983 and February 1984 notes, and did not attempt to subject the Wentworths to multiple liability. The Wentworths' argument about failure of consideration is meritless.

C

The Wentworths assert that the trial court erred in failing to find that the Bank fraudulently induced John Wentworth to sign the December 1984 note.

■ Fraud is a question of fact. *Wentworth II,* 500 N.W.2d at 874. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if this court is left with a definite and firm conviction that a mistake has been made. *Habeck v. MacDonald,* 520 N.W.2d 808, 813 (N.D.1994).

The trial court's finding of no fraud is not clearly erroneous.

The Wentworths complain that they were led to believe the December 1984 note was not a promissory note, but an "in-house banking" memorandum. The trial court stated it was unclear why the Bank had Wentworth sign the December 1984 note because, even though it was a 15-month note, the Bank conceded it intended to abide by the installment provisions of the March 1984 guaranteed note. Rockswold testified the purpose of the December 1984 note was to get the due date to correspond with the payment dates in the FmHA loan guarantee documents.

Regardless of the Bank's intentions, the fraud must have caused actual damage to support a legal action or defense. *Olson v. Fraase*, 421 N.W.2d 820, 827 (N.D.1988). The trial court found no damage was caused by the Bank holding more than one note representing the same debt. This finding is supported by the testimony of the Wentworths' own banking expert. Indeed, as the trial court noted, all defenses available to the Wentworths under the March 1984 note were also available to them under the December 1984 note. Furthermore, the court's finding that the Wentworths suffered no damage because they were not entitled to have the payments applied as they requested is supported by the testimony of an expert on FmHA practices and procedures. The record also shows by March 1986, the collateral covered by the Bank's security interest was valued at $250,000, while the Bank had outstanding loans to the Wentworths totaling $334,000. The Bank's position was hardly improved by obtaining the loan guarantee and continuing to lend the Wentworths money. We conclude the court's finding that there was no fraud in inducing John Wentworth to execute the December 1984 note is not clearly erroneous.

### D

The Wentworths argue the Bank disavowed the December 1984 note as the enforceable note when Bank officers testified it was intended to be an "in-house banking" memorandum and, because the Bank relied on the March 1984 note as the enforceable note, it should not now be allowed to argue that it can collect under the March 1984 note, the December 1984 note, or a combination of both. In a related argument, the Wentworths assert the trial court's conclusions of law are "mutually exclusive" because, after ruling that the December 1984 note was a valid and enforceable note, the trial court ruled the December 1984 note was a renewal of the March 1984 note and appeared to use the terms and provisions of the March 1984 note in deciding the Wentworths were in default.

The existence of the December 1984 note, or "in-house banking" memorandum, has caused endless confusion during this prolonged litigation. But the trial court's use of the terms of the March 1984 note to interpret the December 1984 note conforms with John Wentworth's testimony that the March 1984 note set forth the contract between the parties for the guaranteed debt. John Wentworth admitted he owed $225,000 plus accrued interest on March 6, 1984. The court found all notes evidencing the debt had been surrendered to the court and there was no possibility of double recovery. *Compare* NDRCivP 55(a)(1) (default judgment for "sum certain" authorized "upon affidavit of the amount due and upon production of the written instrument, if any, upon which the claim is founded....") The Wentworths have not suggested that the amount of the debt to the Bank has been improperly computed, nor have they proven how they have been damaged by the Bank's use of the various notes.

### III

■ Relying on *Matter of Estate of Risovi*, 429 N.W.2d 404 (N.D.1988), the Wentworths assert that, because this court in *Wentworth II* ruled the first judge should have disqualified himself from the case, all orders signed by that judge were void. As a result, the Wentworths argue, that judge's order granting the Bank immediate possession of the collateral was void, and because an execution carried out under a void order generally results in liability for conversion or trespass, *see, e.g., Beede v. Nides Finance*

*Corporation,* 209 Minn. 354, 296 N.W. 413, 414 (1941), the court in this case erred in not granting them relief on their conversion claim. We disagree.

In *Risovi,* a probate judge, before becoming a judge, had given advice and billed a beneficiary of the will involved in the probate. The judge recused himself after the beneficiary moved for disqualification, and another judge was assigned to the case. Finding "no obvious unethical behavior" in the recused judge's participation in the case, we held that judge's nonministerial rulings were void "because the appearance of propriety is so important to our judicial system." *Risovi,* 429 N.W.2d at 407. Because those orders were void, we further held that they could not be ratified by the judge who had been assigned to the case after recusal of the first judge.

The basis for disqualification of the first judge in *Wentworth II* was not serious enough to void that judge's prior rulings. First, the violation of the Rules of Judicial Conduct was technical, and there was "no hint of actual bias" by the judge. *Wentworth II,* 500 N.W.2d at 879. The litigation affecting that judge, who was represented by a member of the Bank's law firm, was nearing completion, and we described that litigation as "nothing more than a nuisance lawsuit" and a "veritable definition of frivolity for purposes of ... sanctions in this jurisdiction." *Id.* If the case had been "an ordinary, uncomplicated, and straight forward foreclosure action, or if the case had been submitted to a jury," disqualification would not have been required. *Id.* We reluctantly reversed the judgment, however, only after considering the complicated nature of this foreclosure action and the judge's unintentional entanglement with the law firm through the frivolous lawsuit. We reviewed the judge's rulings, both pretrial and on the merits, and specifically upheld the rulings that the Bank's law firm was not disqualified from representing the Bank and that the Wentworths were not entitled to a jury trial. We also noted the evidence was sufficient to support the judge's rulings on the factual issues presented. Only because the judge had adopted virtually all of the Bank's expla-nations for its actions did we conclude a reasonable person could reasonably question the judge's impartiality.

■ Prior orders of a disqualified judge generally are not void where the judge was not personally biased or prejudiced against a party, the disqualification was based on only a possible appearance of impropriety, and the challenged rulings were correct. *See Hull and Smith Horse Vans, Inc. v. Carras,* 144 Mich.App. 712, 376 N.W.2d 392, 395 (1985), *cert. denied,* 479 U.S. 822, 107 S.Ct. 91, 93 L.Ed.2d 43 (1986). This trial court correctly ruled that the judicial disqualification in *Wentworth II* did not void the order granting the Bank immediate possession of the Wentworth's collateral.

## IV

■ The Wentworths assert the trial court committed reversible error in denying their request for a jury trial. We disagree.

### A

The Wentworths first argue the Bank's action was not an equitable action for foreclosure, where there is no right to a jury trial, but rather was a legal action for possession of specific property under NDCC Chapter 32–07, where, they allege, there is a right to a jury trial.

■ In *Wentworth II,* 500 N.W.2d at 867 and 873, we described the Bank's lawsuit as one "to foreclose its security interest" in the Wentworths' farm equipment, livestock, crops, and proceeds securing the promissory notes, and held the Wentworths' counterclaims were incidental to their defenses and arose out of the seizure of collateral that took place "as part of the Bank's main foreclosure action." The law-of-the-case doctrine "encompasses not only those issues decided on the first appeal, but also those issues decided by the trial court prior to the first appeal which were not presented for review at the first appeal." *Tom Beuchler Const. v. City of Williston,* 413 N.W.2d 336, 339 (N.D.1987). In this appeal, the Wentworths cannot challenge the Bank's action for not being an equitable one to foreclose.

## B

The Wentworths also claim they were entitled to a jury trial on their "independent action" against the Bank. The Wentworths had separately sued the Bank for fraud on the court and conversion and, after remand, amended their complaint to allege a specific claim for the loss of their property under a void òrder for repossession. On remand, the trial court consolidated the separate suit for trial together with the Wentworths' counterclaims in the foreclosure action.

 A party has no absolute right to a jury trial in an equitable action, nor is a party entitled to a jury trial when the party raises legal defenses denominated as counterclaims. *Wentworth II,* 500 N.W.2d at 872–873. Even when the counterclaim seeks monetary damages, there is no entitlement to a jury trial if the damage claim is incidental to and dependent upon a primary claim where a jury trial is not allowed. *Wentworth II,* 500 N.W.2d at 873. A claim for fraud on the court is in the nature of an equitable action for relief from the judgment. *See Hamilton v. Hamilton,* 410 N.W.2d 508, 516 (N.D.1987); *Gajewski v. Bratcher,* 240 N.W.2d 871, 893 (N.D.1976); *Wentworth II,* 500 N.W.2d at 872 n. 6; *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Therefore, the Wentworths were not entitled to a jury trial on their claim for fraud on the court.

The first three counts in the Wentworths' "independent action" were essentially the same as the first three counts of their original counterclaim that we held in *Wentworth II* were incidental to a primary claim for which a jury trial is not allowed. The remaining count claimed conversion of the Wentworths' property by the allegedly improper seizure of the collateral that began the Bank's main foreclosure action. We conclude the trial court did not err in denying the Wentworths' request for a jury trial.

## V

 The Wentworths assert the trial court erred in failing to find that the Bank committed fraud on the court. In *Wentworth II,* 500 N.W.2d at 872 n. 6, we explained:

"Fraud on the court" has been characterized as "a scheme to interfere with the judicial machinery performing the task of impartial adjudication, as by preventing the opposing party from fairly presenting his case or defense." *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 195 (8th Cir.1976). The term "contemplates conduct so egregious that it undermines the integrity of the judicial process." *Stone v. Stone,* 647 P.2d 582, 586 n. 7 (Alaska 1982). A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel, and must be supported by "clear, unequivocal and convincing evidence." *Pfizer, Inc.*

The Wentworths assert there was clear and convincing evidence of fraud on the court because the only basis for the trial court's July 1987 order for immediate possession was the hearsay affidavit of the Bank's attorney at the time, Jon R. Brakke, who attested from his "personal knowledge, information and belief" as to the validity of the December 1984 promissory note. This was false and misleading, say the Wentworths, because Brakke had no personal knowledge about the promissory notes, and because the Bank officers testified they were actually operating under the terms of the March 1984 note that was not brought to the attention of the court at the time. They also rely on inconsistent deposition testimony by the Bank's officers, as well as the Bank's change of position during the proceedings about which of the March 1984 or December 1984 notes was the true evidence of indebtedness. All of this, the Wentworths argue, clearly and convincingly evidences that the Bank and its attorneys took deliberate and positive steps to conceal the existence of the March 1984 note, and to misrepresent the true nature of the December 1984 note.

The Wentworths' characterization of the Bank's actions overstates what happened. John Wentworth obviously knew about the March 1984 note. He admitted that he had a copy of the March 1984 note, but had "misplaced" it when the hearing on the motion for

immediate possession of the collateral took place. A Bank officer testified no one at the Bank made a conscious decision to not deliver the March 1984 note to Brakke. Instead, that note was not sent to Brakke because it was never put in the Bank's books. Brakke testified he signed the initial affidavit because he wanted to get the lawsuit started as soon as possible since farming season was fast approaching and since mailing the affidavit from Fargo to the Bank in Forman would have delayed the suit more.

Moreover, the trial court found there was no advantage to the Bank in suing on the December 1984 note rather than the March 1984 note because both notes represented the same debt and thus the amount owed by the Wentworths was the same under either note. The same interest rate appeared on the notes as well as the guarantee documents. The March 1984 note had a "default and acceleration" clause giving the Bank a right to sue for the entire indebtedness. Because of the default clauses in the other notes, a default under the operating loan notes became a default under the guaranteed loan, regardless of whether the loan was represented by the March 1984 note or the December 1984 note. The notes were also secured by the same collateral.

▮ In this case, the trial court properly recognized that fraud on the court requires the most egregious misconduct directed to the court itself. Indeed, well respected legal scholars also suggest that fraud on the court is limited to "very unusual cases involving 'far more than an injury to a single litigant,'" and that "[n]ondisclosure by a party or the party's attorney has not been enough" to establish fraud on the court. 11 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2870, at p. 415, 416–417 (1995) (footnotes omitted). *See, e.g., Kerwit Medical Products, Inc. v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (5th Cir.1980) ("[T]he mere nondisclosure to an adverse party and to the court of facts pertinent to a controversy before the court does not add up to 'fraud upon the court' ...."); *Gajewski*, 240 N.W.2d at 893 (describing bribery of judge or employment of counsel to improper-

ly influence the court as examples of fraud on the court).

Here, the trial court found the Bank had no intent to harm or injure the Wentworths by holding concurrent notes representing the same debt, the Bank gained no advantage by holding the two notes, its holding two concurrent notes for the same debt caused no loss or damage to the Wentworths, and the Bank did not act with oppression, fraud or malice in its dealings with the Wentworths. The court observed, although the Bank's conduct could be "characterized by many adjectives," it was not the most egregious misconduct directed to the court itself. We conclude the court's finding that the Bank did not commit fraud on the court is not clearly erroneous.

## VI

▮ The Wentworths contend the trial court should have found that the Bank committed conversion by seizing the Wentworths' property because there was no factual basis for the court's order allowing the Bank immediate possession of the collateral. Conversion is a tortious detention of personal property from the owner, or its destruction, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner. *Napoleon Livestock Auction, Inc. v. Rohrich*, 406 N.W.2d 346, 351 (N.D.1987). The trial court ruled that the Bank did not exercise improper dominion or control over any of the Wentworths' personal property, did not improperly interfere with any of the Wentworths' possessory rights in their personal property, and did not commit conversion.

The Wentworths' assertion there was no factual basis for the first judge's order is based on the Bank's use of the affidavit of its attorney that the Wentworths claim was "hearsay" and "false." We reject the Wentworths' arguments.

▮ First, hearsay evidence, if not objected to, may properly be used in a court proceeding. *See, e.g., Eastburn v. J.K.H.*, 392 N.W.2d 406, 408 (N.D.1986); *In Interest of S.W.*, 290 N.W.2d 675, 678 (N.D.1980). As we noted in *Wentworth II*, 500 N.W.2d at 870 n. 4, the Wentworths did not object to

Brakke's affidavit on hearsay or competency grounds at the hearing on immediate possession. The Wentworths have therefore waived any hearsay objection to that affidavit.

Moreover, although the Wentworths assert the Bank "deliberately procured the repossession order through a false and valueless affidavit," the trial court found otherwise and further ruled the Bank was actually entitled to immediate possession of all of the collateral almost one year before the order for immediate possession was sought. The Wentworths' argument is without merit.

## VII

The Wentworths assert the trial court should have disqualified the Bank's law firm from representing it during the retrial. In *Wentworth II*, 500 N.W.2d at 869–872, we agreed with the trial court that, although Brakke's attesting to the validity of the notes caused confusion, the discrepancies between his and the Bank officers' testimonies was not in such conflict that disqualification of Brakke's law firm was required under the North Dakota Rules of Professional Conduct. Attorney W. Todd Haggart represented the Bank during the retrial, as he did during the first trial. After the Wentworths renewed their motion to disqualify the law firm, the court again denied it, noting "there have been no new developments in this case from the time it was reversed and remanded for a new trial...."

On appeal, the Wentworths again rely on the same inconsistencies between statements of the Bank officers and Brakke about the promissory notes. However, unlike the first time when Brakke's deposition was read, the Wentworths point out Brakke testified in person on remand. But the Wentworths do not specify how he testified any differently than he did in the deposition. The Wentworths also assert that disqualification was required because the court consolidated the fraud on the court action with the original action. But they do not give any persuasive reasons why that should have required disqualification.

The only apparent difference in development of the facts on this issue came from Beth Wentworth's testimony during the retrial. She testified that Brakke was one of three attorneys she and John Wentworth met with in September 1986 to inquire about the possibility of initiating a bankruptcy. She testified the meeting lasted about 30 minutes and summarized the substance of the conversation:

> I had written on a piece of paper just some of the facts that had happened up to this point, and how we felt about it, and we wanted to present these to him to see what our course of action could be.

According to Beth Wentworth, Brakke told them at the end of the meeting he could not represent them because he was representing the Bank. Brakke testified that he could not remember whether he met with the Wentworths in September 1986. The Wentworths did not renew their motion for disqualification after Beth Wentworth testified.

These circumstances did not require disqualification of Brakke's law firm. The Wentworths never mentioned this alleged meeting with Brakke during the first trial, and when the subject came up during the second trial, they did not renew their objection. The Wentworths did not testify that Brakke gave them legal advice, nor did they present any specific evidence that they shared confidences or privileged information with him. On this record, we conclude the trial court did not abuse its discretion in refusing to disqualify Brakke's law firm from representing the Bank.

We have considered the other arguments presented, and they do not affect our decision. We affirm the judgments.

VANDE WALLE, C.J., and
SANDSTROM and NEUMANN, JJ., concur.

The Honorable Mary Muehlen Maring was not a member of the Court when this case was heard and did not participate in this decision.