2013 ND 85

In re MATTHEW LARSON TRUST AGREEMENT DATED MAY 1, 1996

and

In re Matthew J. Larson Irrevocable Retirement Trust II Agreement Dated December 1, 2009.

William E. and Patricia A. Clairmont, Petitioners and Appellants

v.

Greg Larson, parent and guardian of N.J.L. and L.M.L., Respondent and Appellee

and

Sean Smith as Trustee of the Elizabeth H. Larson Trust Agreement Dated May 1, 1996; Jared D. Larson Trust Agreement Dated May 1, 1996; and Samuel G. Larson Trust Agreement Dated May 1, 1996, Respondents.

No. 20120319.

Supreme Court of North Dakota.

May 28, 2013.

Ronald H. McLean (argued), Timothy G. Richard (appeared) and Peter W. Zuger (on brief), Fargo, N.D., for petitioners and appellants.

Rebecca L. Binstock (argued) and Paul R. Sanderson (appeared), Bismarck, N.D., for respondent and appellee.

CROTHERS, Justice.

[¶ 1] William and Patricia Clairmont appeal from a judgment interpreting two trusts the Clairmonts created for the benefit of their grandson, Matthew Larson, and dismissing the Clairmonts' petition to reform the trusts. The Clairmonts argue the district court erred in denying their petition to reform the trusts because there was clear and convincing evidence of a mistake of law that affected their intent and the terms of the trusts. We conclude the court misapplied the law construing trusts involving a mistake of law and the correct application of the law to the court's findings requires reformation of the trusts. We affirm in part, reverse in part and remand for reformation of the trusts in accordance with this decision.

## I

[¶ 2] The Clairmonts have four children. In 1975, the Clairmonts' daughter, Cindy Larson, married Greg Larson. Cindy and Greg Larson have four children together, including a son, Matthew Larson. Cindy and Greg Larson were divorced in 2001. Greg Larson remarried and in 2004 had two children, N.J.L. and L.M.L., with his second wife.

[¶ 3] Since 1991, the Clairmonts have created various trusts to benefit their grandchildren using different attorneys to draft each set of trusts. In 1996, the Clairmonts created a separate trust for each grandchild. The Clairmonts' son-in-law, Greg Larson, drafted the trust documents. At the time, Greg Larson still was married to Cindy Larson. An irrevocable trust was created for Matthew Larson, the Matthew Larson Trust Agreement ("Trust I"), which specified mandatory distributions would start when Matthew Larson was 40 years old. The trust also included a provision stating how the trust would be distributed if Matthew Larson died:

> "If the Beneficiary shall die before receiving complete distribution of the trust, the Trustee shall distribute the balance of the trust as the Beneficiary designates under his or her Last Will and Testament or under any other instrument exercising this general power of appointment. In the event that the Beneficiary does not exercise this general power of appointment, the Trustee shall distribute the balance of the trust to the Beneficiary's surviving issue by right of representation ... and if Beneficiary leaves no surviving issue, then equally to Beneficiary's brothers and sisters and the issue of a deceased brother or sister by right of representation."

[¶ 4] In 1998, the Clairmonts created irrevocable retirement trusts for each grandchild, including Matthew Larson.

William Guy III drafted the trust documents. Matthew Larson's retirement trust specified that distributions of the trust would begin when Matthew Larson was 65 years old and included a provision for distribution in the event of his death.

[¶ 5] In 2009, the Clairmonts created the Matthew J. Larson Irrevocable Retirement Trust II Agreement ("Trust II"), which was drafted by Brian Bergeson. Trust II replaced the 1998 retirement trust and included terms very similar to the 1998 retirement trust. The trust specified Matthew Larson would receive an annual distribution upon reaching age 65 and included a provision for the distribution of the assets upon Matthew Larson's death:

> "Upon the death of Matthew, the then remaining trust estate shall be handled as follows:
>
> (1) As Matthew may direct in his valid testamentary instrument expressly referring to this general power of appointment.
>
> > (a) Matthew may appoint to the creditors of his estate.
> >
> > (b) The power of appointment shall be exercisable by Matthew alone and in all events.
>
> (2) To the extent that Matthew shall not have exercised the foregoing power of appointment, then as follows:
>
> > (a) if Matthew is survived by descendants, then to, or for the benefit of, those descendants as provided in Paragraph 2 of this Article; or,
> >
> > (b) if Matthew is not survived by descendants, then:
> >
> > > i. if Matthew is survived by a wife and his wife has attained age sixty (60) as of the date of Matthew's death, then for the benefit of his wife pursuant to Paragraph 3 of this Article;

ii. if Matthew is not survived by a wife or if he is survived by a wife who has not attained age sixty (60) as of the date of Matthew's death, then one (1) collective share for the brothers and sisters of Matthew then living to be handled as provided in Paragraph 2 of this Article as if Matthew's brothers and sisters were children of Matthew[.]"

[¶ 6] Matthew Larson died in March 2011. Matthew Larson was not married and did not have any children. No evidence exists he had a will. The Clairmonts petitioned the district court to interpret the trust agreements to include only Matthew Larson's brothers and sisters who are lineal descendants of the Clairmonts as beneficiaries of the trusts or to reform the trusts. The Clairmonts argued they intended the trusts to benefit their grandchildren and did not intend for Greg Larson's children from his second marriage to benefit from the trusts. They argued a mistake was made in drafting the trusts if the phrase "brothers and sisters" is interpreted to include Matthew Larson's siblings who are not lineal descendants of the Clairmonts.

[¶ 7] After an evidentiary hearing, the district court declared that the children of Greg Larson's second marriage are beneficiaries of both trusts because the trusts state Matthew Larson's "brothers and sisters" are beneficiaries and N.D.C.C. § 30.1–04–07 states "[r]elatives of the half blood inherit the same share they would inherit if they were of the whole blood." The court also dismissed the Clairmonts' petition to reform the trusts, ruling the Clairmonts failed to establish a mistake of fact or law sufficient to reform either trust.

II

[¶ 8] The Clairmonts argue the district court erred in dismissing their petition to reform the trusts. They contend they met the requirements for reformation of a trust under N.D.C.C. § 59–12–15 because clear and convincing evidence established they made a mistake of law when the trusts were created and because their intent and the terms of the trusts were affected by the mistake. They claim they intended for only their lineal descendants to benefit from the trusts, they believed the term "brothers and sisters" would ensure the trust assets were only distributed to their lineal descendants and they were mistaken about the legal effect of the term "brothers and sisters."

[¶ 9] The interpretation and application of a statute is a question of law, which is fully reviewable on appeal. *In re Estate of Samuelson*, 2008 ND 190, ¶ 11, 757 N.W.2d 44. Determining a party's intent and whether a mistake of fact or law exists are questions of fact, which are subject to the clearly erroneous standard of review. *See Agnes M. Gassmann Revocable Living Trust v. Reichert*, 2011 ND 169, ¶ 14, 802 N.W.2d 889. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, "there is no evidence to support it, or when, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made." *American Bank Center v. Wiest*, 2010 ND 251, ¶ 13, 793 N.W.2d 172 (quoting *Sargent Cnty. Bank v. Wentworth*, 500 N.W.2d 862, 874 (N.D.1993)).

[¶ 10] Reformation of a trust is an equitable remedy designed to correct an error or defect in a trust document so it reflects the settlor's actual intent. *See* N.D.C.C. § 59–12–15; *cf. Spitzer v. Bartelson*, 2009 ND 179, ¶ 22, 773 N.W.2d 798 (reformation of a contract is an equitable remedy to rewrite a contract to accurately

reflect the parties' intent). Section 59–12–15, N.D.C.C., authorizes a district court to reform the terms of a trust to conform to a settlor's intent:

"The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement."

Clear and convincing evidence leads to a firm belief or conviction that the allegations are true. *In re Disciplinary Action Against McGuire*, 2004 ND 171, ¶ 8, 685 N.W.2d 748. "Although it is a higher standard of proof than proof by the greater weight of the evidence, the evidence presented need not be undisputed to be clear and convincing." *Id.*

[¶ 11] The district court denied the Clairmonts' petition for reformation, finding the Clairmonts failed to establish a mistake of law or fact exists:

"The Clairmonts, not being aware of N.D. Cent.Code § 30.1–04–07 or its applicability to trust instruments, is not a grounds for reforming the trust agreements. This is because of the 'time-honored principle that all persons are presumed to know the law.' *State v. Carpenter*, 301 N.W.2d 106, 110 (N.D. 1980). 'Not all mistakes of law will justify reformation of a contract. Ignorance of law must be distinguished from misapprehension of law with which both parties are familiar.' *Hovden v. Lind*, 301 N.W.2d 374, 379 n. 2 [ (N.D.1981) ].

. . . .

"At the time Trust I was written, Greg and Cindy were still married. When Trust II was written, however, Greg and Cindy were divorced, and Greg had remarried his second wife and already had the two children of that marriage, N.J.L. and L.M.L. As stated earlier, the Clairmonts' ignorance of the law cannot be a basis for reforming these trust agreements. Misapprehension of the law is the only mistake of law that is available to the Clairmonts here.

"Here, N.D. Cent.Code § 30.1–04–07 is clear in its terms requiring that relatives of the half blood receive the same share in the trust agreement as if they were of the whole blood. The Clairmonts testified that they never intended to have step-grandchildren benefit. In fact, both the Clairmonts testified that it never really entered their mind at all whether Greg's children of a second marriage would benefit from these trusts.

"The Clairmonts offered no testimony that they were familiar with the statute and somehow misapprehended its application. Here, to prevail on a reformation claim, based upon a mistake of law, it must be established by clear and convincing evidence. 'Clear and convincing evidence is evidence that leads to a firm belief or conviction the allegations are true.' *In re E.G.*, 2006 ND 126, ¶ 7, 716 N.W.2d 469.

"Here, the Court concludes that the Clairmonts have failed to establish by clear and convincing evidence a mistake of law sufficient to reform the trust instruments.

"As stated earlier, N.D. Cent.Code § 59–12–15 provides that reformation is available 'to conform the terms to the settlor's intention.' That intention should be determined at the time of the drafting of the documents. Other courts have concluded that in reforming a trust agreement, it is necessary to discern the settlor's intent in light of the facts and circumstances at the time the instrument was executed. *See, e.g., In re Stephen L. Chapman Irrevocable Trust*

*Agreement,* 953 N.E.2d 573, 579 (Ind.Ct. App.2011).

"N.D. Cent.Code § 9–03–13 defines mistake of fact as follows:

Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:

1. An unconscious ignorance or for- getfulness of a fact, past or present, material to the contract; or

2. Belief in the present existence of a thing material to the contract which does not exist, or in the past existence of such a thing which has not existed.

"Here, the Clairmonts did not testify about any forgetfulness of a past or present fact at the time of the execution of the trusts. As stated earlier, at the time of the execution of Trust I, Greg and Cindy were married. Both the Clairmonts testified that the possibility the trusts could benefit Greg's children of a second marriage never entered their mind. That is certainly understandable at the time Trust I was written. The fact that an earlier Trust Agreement dated in December, 1991, would not have allowed Greg's children of a second marriage to be beneficiaries under the trust is of really no consequence. That may be important if one of the scriven- ers had said that they had made an error and evidence of the error could have been the earlier trusts that were written.

"What overrides all of this is the Clairmonts never anticipated that Mat- thew would die suddenly at the age of 25. But the fact of Matthew's death cannot be a mistake of fact, past or present, in relation to the execution of the Trust Agreement, and thus, cannot be a mistake of fact. There· was no testimony that the Clairmonts made an affirmative representation to the scriv- ener of the Trust I that only their issue should be beneficiaries of the trust. There was no reason for the Clairmonts to make that representation· to the scriv- eners. This was an issue that they nev- er thought about at all in relation to the execution of Trust I.

"Therefore, the Court concludes that the Clairmonts have not proved by clear and convincing evidence that a mistake of fact occurred in connection with Trust I justifying a reformation of the Trust Agreement.

"Trust II was written after Greg and Cindy were divorced, and after N.J.L. and L.M.L. were born. Yet the residual provisions of Trust II mirrored those of Trust I. Even then, the Clairmonts testi- fied that they never gave any thought that Trust II would benefit the children of Greg's second marriage. But again, there was no evidence from the Clair- monts that they expressed that intent to the scrivener. They knew that Greg had divorced Cindy and had two chil- dren by a second marriage, so therefore, that could not be a mistake of fact.

"The Court concludes that the Clair- monts have failed to establish by clear and convincing evidence that they acted under a mistake of fact sufficient to reform Trust II."

[¶ 12] Section 59–12–15, N.D.C.C., per- mits reformation of a trust if clear and convincing evidence demonstrates a mis- take of fact or law affected both the set- tlor's intent and the terms of the trust. This Court has applied but not interpreted this statute and its requirements in prior trust reformation cases. *See Agnes M. Gassmann Revocable Living Trust,* 2011 ND 169, 802 N.W.2d 889 (affirming refor- mation of a trust, evidence supported the findings). Section 59–12–15, N.D.C.C., was enacted in 2007 as part of legislation adopting the Uniform Trust Code. 2007

N.D. Sess. Laws ch. 549. Statutory provisions derived from a uniform act must be construed to effectuate the act's general purpose to provide consistency and uniformity in the law. N.D.C.C. § 1–02–13; *see also In re Estate of Paulson,* 2012 ND 40, ¶ 19, 812 N.W.2d 476.

[¶ 13] Section 59–12–15, N.D.C.C., adopts section 415 of the Uniform Trust Code. 2007 N.D. Sess. Laws ch. 549. The comment to section 415 states that it copies *Restatement (Third) of Prop.: Donative Transfers* § 12.1 (Tentative Draft No. 1, 1995) and that the comments and reporter's notes of the Restatement provision should be considered for discussion of the rule and its application to illustrative cases. Unif. Trust Code § 415 cmt. The Restatement provides that a donative document, including a trust, may be reformed to conform to the donor's intent if clear and convincing evidence exists "(1) that a mistake of fact or law, whether in expression or inducement, affected specific terms of the document; and (2) what the donor's intention was." *Restatement (Third) of Prop.: Donative Transfers* § 12.1 (Tentative Draft No. 1, 1995). To support reformation, the petitioner, using extrinsic evidence, must establish by clear and convincing evidence "(1) that a mistake of fact or law affected the expression, inclusion, or omission of specific terms of the document and (2) what the donor's actual intention was in a case of mistake in expression or what the donor's actual intention would have been in a case of mistake in the inducement." *Id.* cmt. g. The purpose of allowing reformation is to ensure effect is given to the settlor's intent and to prevent unjust enrichment at the expense of the *intended* beneficiary. *Id.* cmt. b. "The claim of an unintended taker is an unjust claim," and allowing reformation prevents the unjust enrichment of a mistaken beneficiary at the expense of the intended beneficiary. *Id.*

[¶ 14] Here, the district court considered and applied statutory and case law related to the reformation of contracts to determine whether the Clairmonts satisfied the requirements for reformation. Greg Larson argues we should look at N.D.C.C. § 9–03–14, the definition of mistake of law in contract cases, for guidance in interpreting what is required to establish a mistake of law under N.D.C.C. § 59–12–15. However, reformation of a trust is different from reformation of a contract.

■■ [¶ 15] Reformation of a contract generally requires a mutual mistake between the parties. *See* N.D.C.C. § 32–04–17 (revision of a contract for fraud or mistake); N.D.C.C. § 9–03–14 (mistake of law defined for contract disputes). For reformation of a contract, both parties must be mistaken about the legal effect of the language used in the contract and both parties must make substantially the same mistake as to the law; otherwise, reformation of the contract would impose a contract that the parties did not agree upon. *See* N.D.C.C. § 9–03–14; *Lange v. Cusey,* 379 N.W.2d 775, 778–79 (N.D.1985) (ignorance of a possible claim was not grounds for rescission of a release discharging liability when there was no evidence the other party knew about releasing party's ignorance); *see also Ward v. Ward,* 70 Mass. App.Ct. 366, 874 N.E.2d 433, 437–38 (2007) (reformation of a contract based solely on proof of one party's mistake as to its legal effect would impose a contract on the other party for which they had not bargained).

■ [¶ 16] Mutuality of mistakes is *not required to reform a trust* because the settlor generally does not receive any consideration for the creation of the trust and only the settlor's intent is involved in creating the trust. *See Carlson v. Sweeney,*

*Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191, 1199 (Ind.2008) (discussing the difference in mistakes in contract and trust cases); *Ward* 874 N.E.2d at 437–38 (discussing mistake of law in contract cases and why trust law does not apply); *Berman v. Sandler*, 379 Mass. 506, 399 N.E.2d 17, 19 (1980). Because the creation of a trust is different than the execution of a contract, legal principles related to reformation of a contract do not control in trust cases.

[¶ 17] No statutory definition for mistake of law exists in N.D.C.C. tit. 59. Black's Law Dictionary defines "mistake of law" as "[a] mistake about the legal effect of a known fact or situation." *Black's Law Dictionary* 1092 (9th ed.2009). Section 59–12–15, N.D.C.C., states the mistake of law may be in either expression or inducement. The Clairmonts contend there was clear and convincing evidence of a mistake of law in the inducement.

[¶ 18] "A mistake in the inducement occurs when the terms of the trust accurately reflect what the settlor intended to be included or excluded but this intention was based on a mistake of fact or law." Unif. Trust Code § 415 cmt. Mistakes in the inducement often are traced to the settlor's errors. *Id.* "A mistake in the inducement arises when a donative document includes a term that was intended to be included or fails to include a term that was not intended to be included, but the intention to include or not to include the term was the product of a mistake of fact or law." *Restatement (Third) of Prop.: Donative Transfers* § 12.1 cmt. i (Tentative Draft No. 1, 1995). The Restatement includes an illustration of a mistake in the inducement:

> "G created an inter-vivos trust. The trust document did not contain a clause reserving to G a power to revoke the trust. Controlling law provides that a trust is irrevocable in the absence of an expressly retained power to revoke. After G signed the document, G's financial condition changed and G sought to revoke the trust. Extrinsic evidence shows that G intended to create a revocable trust and did not understand the need for a revocation clause. If this evidence satisfies the clear-and-convincing-evidence standard of proof, the trust document is reformed to insert a power to revoke."

*Id.* cmt. i, illus. 7.

[¶ 19] The district court ruled ignorance of the law cannot be a basis for reforming a trust under contract principles and the Clairmonts had to show they were familiar with the statute but misapprehended its application. The Restatement illustration is similar to the facts of this case and demonstrates a misapprehension of the law is not required. In the illustration, G intended to create a revocable trust but did not understand he was required to expressly retain the power to revoke under controlling law. The illustration does not state G was aware of the law but misapprehended its application. Like the illustration, the Clairmonts claim they intended that only their lineal descendants would benefit from the trusts, they believed the term "brothers and sisters" only would include their own lineal descendants, and they did not understand the term "brothers and sisters" would include Greg Larson's children from his second marriage.

[¶ 20] Section 30.1–04–07, N.D.C.C., governs intestate succession for kindred of half blood and states, "Relatives of the half blood inherit the same share they would inherit if they were of the whole blood." This provision applies to trusts under N.D.C.C. § 30.1–02–01(5). Although the Clairmonts may not have been aware of N.D.C.C. § 30.1–04–07, they argue they misunderstood the meaning of "brothers

and sisters" and believed it meant full-blooded siblings. They claim this mistake of law affected both the terms of the trusts and their intent. If there was clear and convincing evidence the Clairmonts intended only their lineal descendants would benefit and they did not understand the term "brothers and sisters" would include half-blooded siblings, a mistake of law existed sufficient to satisfy the statutory requirements for reformation of the trusts. *Cf. Ryan v. Ryan*, 447 Mass. 1003, 849 N.E.2d 183, 184 (2006) (term "heirs" as used in the trust did not conform to settlors' intent because "heirs" includes surviving spouse under state law and settlors did not intend to include any surviving spouse, reformation affirmed applying Massachusetts law related trust to reformation). We conclude the district court misapplied the law in using contract law to determine the Clairmonts did not meet the statutory requirements for reformation of the trusts under N.D.C.C. § 59–12–15.

[¶ 21] Although the district court misapplied the law for reformation, some of the court's findings support reformation under the correct application of the law. The court found, "The term 'brothers and sisters,' as used in the May 1, 1996 trust and the December 1, 2009 trust, includes N.J.L. and L.M.L. as they are brothers and sisters of the half blood. The Clairmonts were unfamiliar with N.D. Cent. Code § 30.1–04–07 and its applicability to the May 1, 1996 trust and the December 1, 2009 trust." The court found the Clairmonts never considered whether Greg Larson's children from a second marriage would benefit from the trusts. The evidence supports those findings and those findings support reformation under a correct application of the law for mistake of law for reformation of a trust.

[¶ 22] William and Patricia Clairmont each testified they never intended to make gifts to anyone other than their grandchildren who are their blood descendants, they intended that Matthew Larson's brothers and sisters who are Clairmont descendants would become beneficiaries if he died and they never thought half-blooded siblings could become beneficiaries of the trusts. William Clairmont testified he thought he understood the terms of the trusts when he signed the trust documents, but he did not intend for individuals who were not his lineal descendants to benefit and did not understand that the terms would allow that to happen. He testified he was not aware of N.D.C.C. § 30.1–04–07, he believed the phrase "brothers and sisters" would only include the brothers and sisters that were descendants of the Clairmont bloodline and he did not think it included half-blooded siblings. Patricia Clairmont also testified she never thought Matthew Larson's half-blooded siblings could be beneficiaries under terms of the trust, she only considered Matthew Larson's full-blooded siblings as his "brothers and sisters," and she was not aware half-blooded siblings are treated the same as full-blooded siblings under state law.

[¶ 23] Sheri Schrock, a representative for State Bank & Trust who was the trustee for Trust II, testified that the retirement trusts are irrevocable but give the trustee power to merge trusts when the trusts have the same beneficiaries and substantially identical provisions and that Trust II was created to avoid undesirable tax consequences that would occur when certain provisions in the 1998 retirement trust expired. The terms of the 1998 retirement trust and Trust II are very similar, and language about what would happen upon Matthew Larson's death is identical. William Guy III testified he was the attorney who drafted the first version of the retirement trust in 1998, he did not have a discussion with

the Clairmonts about N.D.C.C. § 30.1–04–07, he understood the term "brothers and sisters" in the trust meant Matthew Larson's siblings that were born of a descendant of the Clairmonts and he would have used other specific language to include a half-blooded sibling who was not a descendant of the Clairmonts. Guy also testified the Clairmonts never indicated an intent to include a former son-in-law's new children as potential beneficiaries of the retirement trust. Schrock testified that she was very involved in the process of creating Trust II, that no discussion occurred about anyone other than the Clairmonts' children and grandchildren and that she never heard the Clairmonts say anything about the trust benefitting anyone other than their lineal grandchildren or lineal descendants except the provision allowing the spouse of a grandchild to become a beneficiary.

[¶ 24] The evidence of the purposes of the trusts also supports the Clairmonts' claim that they intended for only their lineal descendants to benefit from the trusts. The trustee for Trust I, Sean Smith, testified the trusts were created for the protection of the Clairmonts' grandchildren and their long-term financial viability. Smith also testified William Clairmont intended any gift he gave would go to his grandchildren or his lineal descendants. Patricia Clairmont testified Trust I was created because they thought it was a good vehicle to get money to their grandchildren and because they wanted both trusts to be irrevocable to ensure no one else could get to the money.

[¶ 25] Although Greg Larson did not present any factual evidence disputing the evidence about the Clairmonts' intent, he nevertheless argues some language of the trust documents does not evince clear and convincing evidence of the Clairmonts' intention to limit the disposition of the trust assets upon Matthew Larson's death to only lineal descendants. Greg Larson argues the Clairmonts intended to allow people who were not their lineal descendants to benefit from the trusts because Trust I gave Matthew Larson the general power of appointment allowing him to designate any person as a beneficiary through a testamentary instrument and Trust II permitted a spouse to become a beneficiary and permitted Matthew Larson to distribute the trust assets to his creditors.

[¶ 26] This Court has said a settlor's intent will be ascertained from the language of the trust document when a trust instrument is unambiguous. *Langer v. Pender*, 2009 ND 51, ¶ 13, 764 N.W.2d 159; *Hecker v. Stark Cnty. Soc. Serv. Bd.*, 527 N.W.2d 226, 230 (N.D.1994). However, *Langer* and *Hecker* are not trust reformation cases; rather, they involved the interpretation of trust documents. Trust reformation cases are inherently different from other interpretation cases, and therefore the same legal principles do not apply. In reformation cases a party claims the trust as it is currently written has an error and does not reflect the settlor's intent. Section 59–12–15, N.D.C.C., specifically states that a trust may be reformed even if its terms are unambiguous. Furthermore, in reformation cases, the plain language or plain meaning rule is disapproved to the extent it excludes extrinsic evidence of a settlor's intent. *See Restatement (Third) of Prop.: Donative Transfers* § 12.1 cmt. d (Tentative Draft No. 1, 1995). Extrinsic evidence is considered in reformation cases. *Id.* The comment to Unif. Trust Code § 415 explains the difference between reformation and resolving an ambiguity:

"Resolving an ambiguity involves the interpretation of language already in the instrument. Reformation, on the other hand, may involve the addition of lan-

guage not originally in the instrument, or the deletion of language originally included by mistake, if necessary to conform the instrument to the settlor's intent. Because reformation may involve the addition of language to the instrument, or the deletion of language that may appear clear on its face, reliance on extrinsic evidence is essential. To guard against the possibility of unreliable or contrived evidence in such circumstance, the higher standard of clear and convincing proof is required.

"In determining the settlor's original intent, the court may consider evidence relevant to the settlor's intention even though it contradicts an apparent plain meaning of the text."

(Citation omitted.)

[¶ 27] Here, the district court found the Clairmonts never considered whether Greg Larson's children from his second marriage would benefit from the trusts. The Clairmonts testified they did not intend for the half-blooded siblings to become beneficiaries, they intended only their lineal descendants would benefit as Matthew Larson's "brothers and sisters" and they wanted the trusts to be evenly split between Matthew Larson's full-blooded siblings if he died without issue. Some language exists in the trusts that would allow individuals who are not the Clairmonts' lineal descendants to benefit from these trusts. However, the evidence is clear from the Clairmonts' testimony that they intended only Matthew Larson's brothers and sisters who are the Clairmonts' descendants would benefit from the trusts if Matthew Larson died without issue and without a will. No evidence exists disputing their testimony. The Clairmonts were mistaken about the legal effect of the term "brothers and sisters" as used in the trust documents. Because the Clairmonts did not know half-blooded siblings are

treated the same as full-blooded siblings under the law, they did not understand the term "brothers and sisters" would include half-blooded siblings. This misunderstanding was a mistake of law affecting the terms of the trusts. Under the correct application of the law and the district court's factual findings, the only conclusion to be reached is that a mistake of law was made affecting the terms of the trusts and the Clairmonts' intent. On this record, we conclude the Clairmonts are entitled to reform the trusts.

### III

[¶ 28] We conclude the district court misapplied the law and the Clairmonts' petition to reform the trusts should be granted. We affirm in part, reverse in part and remand to the district court for reformation of Trusts I and II in accordance with this decision to provide that only Matthew Larson's brothers and sisters who are descendants of the Clairmonts may benefit from the trusts.

[¶ 29] GERALD W. VANDE WALLE, C.J., JOHN C. McCLINTOCK, JR., D.J., and GARY H. LEE, D.J., concur.

[¶ 30] The Honorable GARY H. LEE, D.J., and the Honorable JOHN C. McCLINTOCK, JR., D.J., sitting in place of KAPSNER, J., and SANDSTROM, J., disqualified.

MARING, Justice, concurring and dissenting.

[¶ 31] I concur in those parts of the majority opinion that set forth the correct law to be applied for reformation of trusts, and I concur in the majority's conclusion that the trial court misapplied the law using contract law to determine the Clairmonts did not meet the statutory requirements for reformation of the trusts under N.D.C.C. § 59–12–15. I, however, dissent

from the majority's conclusion that the trial court's findings of fact support our Court ordering reformation. I am of the opinion that the trial court did not make sufficient findings for this Court to apply the correct law and order reformation; this matter should be remanded to the trial court for it to make the necessary findings of fact and to apply the correct law as set forth in the majority opinion.

[¶ 32] We have held that determining a party's intent and whether there is a mistake of fact or law is a question of fact. *See Agnes M. Gassmann Revocable Living Trust,* 2011 ND 169, ¶¶ 8–9, 802 N.W.2d 889. The trial court in the present case never made a finding under the clear and convincing evidence standard, as to the intent of the Clairmonts.

[¶ 33] The trial court also never made a finding whether the evidence in this case rises to the level of clear and convincing evidence that the Clairmonts' intent was that only their lineal descendants would benefit from the trusts. We have held that "even when reviewing findings made under a clear and convincing evidence standard, determination of the credibility of witnesses is a function of the trial court. We accord great deference to the trial court's determination of the credibility of witnesses and the weight to be given their testimony." *Gassmann,* at ¶ 9 (citations omitted). The trial court in the present case did not make any findings as to the credibility of any of the trial witnesses.

[¶ 34] To support reformation of a trust, the petitioner must establish by clear and convincing evidence "(1) that a mistake of fact or law affected the expression, inclusion, or omission of specific terms of the document and (2) what the donor's actual intention was in a case of mistake in expression or what the donor's actual intention would have been in a case of mistake in the inducement." *Restate-ment (Third) of Property: Donative Transfers* § 12.1 cmt. g (Tentative Draft No. 1, 1995).

[¶ 35] The trial court must determine if there is clear and convincing evidence the Clairmonts, misapprehended the meaning of "brothers and sisters," believed it meant full-blooded siblings and intended only their lineal descendants would benefit from the trusts. These are all factual findings for the trial court to make.

[¶ 36] The trial court in its memorandum opinion made the following findings of fact after its discussion of the law of interpretation and reformation of trusts and the testimony at trial:

FINDINGS OF FACT

1. On May 1, 1996, the Clairmonts were the grantors in the Matthew Larson Trust Agreement in which Matthew Larson was the beneficiary. Under the terms of that trust, if Matthew Larson died without a will, and with no surviving issue, Matthew Larson's "brothers and sisters" became beneficiaries of the trust.

2. At the time of the creation of the May 1, 1996, trust, Greg was married to Cindy, the Clairmonts' daughter, and Greg and Cindy had four children, Matthew, Elizabeth, Samuel, and Jared.

3. On December 1, 2009, the Clairmonts were the grantors in the Matthew J. Larson Irrevocable Retirement Trust II Agreement, in which Matthew Larson was the beneficiary. Under the terms of that trust, if Matthew Larson died without a will, with no surviving issue, and without a wife who had reached 60 years of age at the time of his death, Matthew Larson's "brothers and sisters" became beneficiaries of the trusts.

4. At the time of the creation of the December 1, 2009 trust, Greg and Cindy were divorced. Greg had remarried and

Greg and his second wife had two children, N.J.L. and L.M.L.

5. On March 4, 2011, Matthew Larson died unexpectedly at the age of 25.

6. At the time of his death, Matthew Larson had never married, had no issue, and had not written a will.

7. The term "brothers and sisters," as used in the May 1, 1996 trust and the December 1, 2009 trust, includes N.J.L. and L.M.L. as they are brothers and sisters of the half blood.

8. The Clairmonts were unfamiliar with N.D. Cent.Code § 30.1–04–07 and its applicability to the May 1, 1996 trust and the December 1, 2009 trust. The Clairmonts, however, are charged with that knowledge under the rule in North Dakota that all persons are presumed to know the law.

9. At the time of the creation of the May 1, 1996 trust and the December 1, 2009 trust, the Clairmonts were not acting under a misapprehension of the law, i.e., the applicability of N.D. Cent.Code § 30.1–04–07 to the trusts.

10. The Clairmonts have failed to prove by clear and convincing evidence a mistake of law at the time of the creation of the trusts.

11. The Clairmonts never expressed to the scriveners of the May 1, 1996 trust and the December 1, 2009 trust, that they intended only linear [sic] descendants of the Clairmonts to benefit under the trust agreements.

12. The Clairmonts were not mistaken as to any present or past fact when they created the trusts of May 1, 1996 and December 1, 2009.

13. The fact that Greg divorced Cindy and had two children by a second wife was not a past or present fact when the May 1, 1996 trust was written and was a past or present fact well known to the Clairmonts when the December 1, 2009 trust was created.

14. The fact that Matthew Larson died at a young age, without a spouse, without issue, and without a will, was not a past or present fact when either trust was created.

15. The Clairmonts have failed to prove by clear and convincing evidence of a mistake of fact at the time of the creation of the trusts.

None of these findings of fact address the Clairmonts' intent or their credibility. None of the findings address the credibility of the other witnesses who testified at trial including three scriveners of the various trusts: William Guy III, Greg Larson, and Sean Smith.

[¶ 37] The respondent, Greg Larson as parent and guardian of N.J.L. and L.M.L., argued to the trial court (1) the Clairmonts knew the trusts were irrevocable and they consequently relinquished any power to revoke, alter, amend, or terminate any trust provision; (2) no evidence existed that a mistake was made by the scriveners of the trust documents; (3) the Clairmonts knew of Matthew Larson's half-siblings, yet never discussed the status of the half-siblings under the trusts with their attorneys; (4) under Trust II, Matthew Larson's wife would receive the trust assets on his death, and she was not a lineal descendant; and (5) the language of the trusts grants Matthew Larson a general power of appointment to distribute the trust assets in whatever manner he thought appropriate at the time of his death. The respondent Greg Larson, parent and guardian of N.J.L. and L.M.L., argued Matthew Larson had the power to change the order of inheritance of the trust assets, but he did not do so. Matthew Larson did not opt out of intestate succession, which allowed for his half-siblings to inherit equally from him as would his full siblings.

[¶ 38] The evidence in the record includes the 1996 Matthew Larson Trust Agreement (Trust I), which included the provision for the general power of appointment: "If the Beneficiary shall die before receiving complete distribution of the trust, the Trustee shall distribute the balance of the trust as the Beneficiary designates under his or her Last Will and Testament or under any other instrument exercising this general power of appointment." The record also contains a copy of the Matthew J. Larson Irrevocable Retirement Trust II Agreement. This trust provided a general power of appointment:

Upon the death of Matthew, the principal and any undistributed income of the trust estate shall be handled as follows:

a. As Matthew may appoint in a will that specifically refers to this general power of appointment.

(1) Matthew may appoint to the creditors of his estate.

(2) This power of appointment shall be exercisable by Matthew alone and in all events.

The trust also provided that Matthew Larson's spouse could benefit from the trust assets:

(2) To the extent that Matthew shall not have exercised the foregoing power of appointment, then as follows:

(a) if Matthew is survived by descendants, then to, or for the benefit of, those descendants as provided in Paragraph 2 of this Article: or,

(b) if Matthew is not survived by descendants, then:

i. if Matthew is survived by a wife and his wife has attained age sixty (60) as of the date of Matthew's death, then for the benefit of his wife pursuant to Paragraph 3 of this Article[.]

The 1991 Clairmont GC Trust Agreement, although no longer in place, preceded Trust I and only allowed the grandchildren of William and Patricia Clairmont to benefit from the trust if Matthew Larson died before receiving complete distribution:

(3) If such grandchild shall die before receiving complete distribution of his or her trust share, the Trustee shall distribute the balance of his or her share to his or her surviving issue by right of representation; or, if such grandchild should die without issue, then to the other living grandchildren named above and to the issue of any deceased grandchild of mine named above by right of representation.

[¶ 39] Differing inferences can be drawn from this evidence and should be made by a trial court when determining the intent of the Clairmonts to limit the benefits of the trusts to lineal descendants. Instead, the majority takes it upon itself to review the transcript of the trial and to make its own findings based on the testimony. The majority, at ¶ 27, concludes: "[T]he evidence is clear from the Clairmonts' testimony that they intended only Matthew Larson's brothers and sisters who are the Clairmonts' descendants would benefit from the trusts if Matthew Larson died without issue and without a will. No evidence exists disputing their testimony." First, as I have pointed out, there does exist evidence contrary to the claim of the Clairmonts about their intent and, second, the Clairmonts' intention is a question of fact for the trial court to decide.

[¶ 40] I would remand the matter to the trial court for it to decide the facts and to apply the correct law as set forth in the majority opinion.

[¶ 41] MARY MUEHLEN MARING